# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| FRIENDS OF THE FLORIDAS; NEW MEXICO WILDERNESS ALLIANCE; WILDEARTH GUARDIANS; GILA RESOURCES INFORMATION PROJECT; AMIGOS BRAVOS; ) ) ) ) ) | Case No.: 1:20-cv-924 |
| Plaintiffs, ) ) | |
| vs. ) ) ) | PETITION FOR REVIEW OF AGENCY ACTION |
| UNITED STATES BUREAU OF LAND MANAGEMENT; WILLIAM CHILDRESS, in his official capacity as District Manager of the BLM Las Cruces District Office; DAVID WALLACE, in his official capacity as Assistant District Manager of the BLM Las Cruces District Office; ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

## INTRODUCTION

1.       Plaintiffs Friends of the Floridas, New Mexico Wilderness Alliance, WildEarth Guardians, Gila Resources Information Project, and Amigos Bravos file this action for vacatur, and equitable, declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706; the Federal Land Policy Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*; and their implementing regulations and policies.  Plaintiffs challenge the actions of the United States Bureau of Land Management (BLM) in authorizing and approving the American Magnesium Foothill Dolomite Mine Project (mine or Project) located on federal public lands managed by BLM near Deming, New Mexico, in violation of these laws, policies, and regulations.

2.      The Project is proposed by American Magnesium, LLC (AM).  As approved by BLM, the Project would construct a new road across public land, conduct extensive exploration drilling, blast and excavate a large open pit, as well as develop additional infrastructure on public land.  Project operations would last 20 years and include 92 truck trips per day, passing through residential areas and Deming on their way to a necessary, but still unreviewed, processing mill.

3.      On August 7, 2020, the District Manager of BLM's Las Cruces District, Defendant William Childress, issued the Decision Record (DR) authorizing the Project.  The DR was based on BLM's Environmental Assessment (EA) issued by the Las Cruces District in July of 2020.  The DR also relied on BLM's "Finding of No Significant Impact" (FONSI) issued on July 31, 2020 by the Assistant District Manager of the Las Cruces District, Defendant David Wallace.  Plaintiffs challenge these BLM actions and decisions.

4.      The Project is adjacent to the Florida Mountains Wilderness Study Area (WSA), and the Florida Mountains Area of Critical Environmental Concern (ACEC).

5.      BLM designated the Florida Mountains ACEC and WSA to protect the significant scenic values, wildlife resources, biological systems including sensitive plant communities, and unique natural features of these lands.  WSAs like the Florida Mountain are areas of public land that the agency recognizes as suitable for inclusion in the National Wilderness Preservation System.

6.      According to BLM: "The Florida Mountains WSA also contains special features such as ecological and scenic features. The WSA contains suitable habitat for a New Mexico State-listed species, night blooming cereus. The peaks and slopes of the Florida Mountains creates a high scenic quality within the WSA (BLM 1991). The higher elevations of the WSA contain steep, angular, red and gray rock outcroppings." EA at 64.

2

7.      Although the directly disturbed lands at the Project site do not lie within the Florida Mountains ACEC and WSA, because of its close proximity to these protected lands, the Project will result in direct and adverse impacts to wildlife, scenic beauty, and recreation in and around the ACEC and WSA.  This is in addition to the significant impacts to the local communities that will be affected by the constant truck traffic to and from the Project, as well as to the BLM-managed public lands at and around the Project site itself.

8.      The Florida Mountains are known as a "sky island," and contain a diversity of habitats not found in the desert below.  Coniferous woodland, mountains scrub (or chaparral), grasslands, and desert shrub and cactus plant communities comprise much of the vegetation. Small pockets of riparian areas are found around the numerous springs in the area.  Canyons in the range direct rainfall into the closed drainage basin of the Mimbres River.

9.      In reviewing and approving the Project, BLM violated NEPA by failing to take the required "hard look" at: (1) the Project's direct, indirect and cumulative impacts; (2) the baseline conditions of the areas that may be affected by the Project; (3) mitigation measures that would reduce Project impacts; and (4) reasonable alternatives to the Project.

10.     BLM approved both extensive exploration drilling as well as the full-scale 20-year mine, yet admits that there is no plan or proposal to process the excavated minerals from the mine.  BLM also admits that neither it nor the company know the extent of the purported ore body, or even if the mine would be a going concern.  In essence, BLM approved a full-scale mine with nowhere to go.

11.     Under NEPA, BLM is obligated to fully consider all of the "direct, indirect, and cumulative impacts" from the mine as well as all "reasonably foreseeable future actions."  BLM admits that the processing mill is necessary, indeed there could be no viable mine without the

3

mill, yet BLM's EA has no details about the mill, outside of a vague reference to a mill location

on the north side of Deming.

12.     Regarding BLM's decision to approve mining even before exploration has

occurred, BLM mining regulations and policy mandate that BLM cannot approve full mining

before the initial exploration.  Pursuant to its duty to "prevent unnecessary or undue degradation"

under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all mineral operations follow the

"performance standards" at 43 CFR § 3809.420.  These standards include the requirement that

BLM review and approve operations in the logical sequence of operations – where exploration is

a prerequisite of actual mining, excavation, and processing.

13.     Plaintiffs had specifically requested that BLM review the reasonable alternative

that BLM only consider the exploration at this time.  Yet BLM refused, violating NEPA's

requirement that BLM fully consider all "reasonable alternatives."

14.     For these and the related reasons addressed herein, Plaintiffs ask this Court to

declare that BLM's actions violate the above-listed federal laws, regulations, and policies.

Plaintiffs ask this Court to vacate and remand BLM's decisions and enjoin any road construction,

exploration, mining, and other Project operations pending compliance with federal law.

## JURISDICTION AND VENUE

15.     This is a suit pursuant to the APA, FLPMA, NEPA, and the implementing

regulations and policies of these laws.  Jurisdiction over this action is conferred by 28 U.S.C. §

1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

16.     Venue is properly before the District of New Mexico pursuant to 28 U.S.C. §§

1391 (b) and (e).  The BLM Las Cruces District Office, and the named defendants are located in

New Mexico.  The Project is located in Luna County, New Mexico.  Plaintiffs' offices and members reside in New Mexico.

17.     The requested relief would redress Plaintiffs' actual, concrete injuries caused by the BLM's failure to comply with duties mandated by NEPA and FLPMA and their implementing regulations and policies.

18.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, & 706.

## PARTIES

19.     Plaintiff FRIENDS OF THE FLORIDAS (Friends) is a nonprofit organization based in the Deming, New Mexico area whose mission is to protect the public lands in the Florida Mountains and nearby areas.  Friends was formed to respond to the environmental threats posed by the Project.  Members of Friends use, enjoy, and value the lands and resources affected by the Project, including the public lands and access roads at and around the Project.  Friends members live in close proximity to the Project and use on a daily basis the roads that the Project will use.  Members of Friends hike, view and photograph wild plant and animal life, and generally enjoy using the lands affected by the Project for recreational, historical, conservation, and aesthetic purposes.  These uses will be immediately and irreparably affected by the direct and adverse impacts to Friends members resulting from the road construction, drilling, blasting, and other Project operations.

20.     Plaintiff NEW MEXICO WILDERNESS ALLIANCE (NMWA) is a 501(c)(3) nonprofit organization based in Albuquerque, New Mexico, dedicated to the protection, restoration, and continued enjoyment of New Mexico's wildlands and wilderness areas, with thousands of members across the state.  The Project at the base of the Florida Mountains will

have significant detrimental effects on the nearby Wilderness Study Area and ACEC and will negatively impact NMWA and its members' ability to recreate and enjoy New Mexico's public lands in the area. Members of NMWA use, enjoy, and value the lands and resources affected by the Project, including the public lands and access roads at and around the Project. Members of NMWA hike, view and photograph wild plant and animal life, and generally enjoy using the lands around and affected by the Project for recreational, historical, conservation, and aesthetic purposes. These uses will be immediately and irreparably adversely affected by the Project's road construction, drilling, blasting, and other operations.

21. Plaintiff WILDEARTH GUARDIANS (Guardians) is a 501(c)(3) non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the West. Guardians has more than 200,000 members and activists, some of whom live, work, or recreate on public lands in the region where the Project is located. Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to ensure that BLM complies with all federal laws when it authorizes projects like this one that can irreversibly damage federal public lands, wildlife, water, and air quality. Guardians' members regularly use, and intend to continue using, public lands that are on, around, and/or within view of lands affected by the Project for hiking, fishing, hunting, wildlife viewing, and aesthetic enjoyment. Guardians' members' enjoyment of public lands in and adjacent to the Project will be immediately, irreparably, and adversely affected and diminished as a result of Defendants' actions. The Project stands to directly alter the natural state of public lands within and beyond the Project area, produce air pollution that is offensive, create noise that disrupts wildlife and recreational enjoyment, and lead to connected development that will further adversely impact

nearby public lands, including road construction, truck traffic, and the construction of processing facilities needed for the mine.

22.     Plaintiff GILA RESOURCES INFORMATION PROJECT (GRIP) is a New Mexico nonprofit membership organization, tax-exempt under section 501(c)(3), established in 1998, and based in Silver City, New Mexico.  GRIP has approximately 1000 members.  GRIP's mission is to promote community health by protecting the environment and natural resources of southwest New Mexico, including protecting surface water, groundwater, wildlife, and air quality.  Most GRIP members live in southwestern New Mexico, including areas in the vicinity of the proposed American Magnesium dolomite mine.  GRIP members use and enjoy the natural resources of southwest New Mexico, including the areas at and around the Project site.  They use these areas for various forms of recreation, including birding, botanizing and wildflower viewing, hiking, and photography, all of which will be irreparably, immediately, and adversely affected by the mine Project.

23.     Plaintiff AMIGOS BRAVOS is a state-wide New Mexico water conservation organization formed in 1988 and based in Taos, New Mexico.  It is a non-profit organization under section 501(c)(3) of the Internal Revenue Code.  Amigos Bravos is guided by social justice principles and dedicated to protecting and restoring the waters of New Mexico.  Since its formation Amigos Bravos has worked to ensure that New Mexico's mining laws protect clean water and the communities that depend on clean water for drinking, irrigation, recreation, and cultural traditions.  Amigos Bravos supporters use and enjoy the natural resources of southwest New Mexico, including the areas at and around the site of the proposed mine.  They use these areas for various forms of recreation, including birding, botanizing and wildflower viewing,

hiking, and photography, all of which will be irreparably, immediately, and adversely affected by the mine Project.

24.     In addition to continuing to use and be adversely affected by the Project, members of Plaintiff groups intend on continuing to use and value the lands at, and affected by, the Project.  These uses are, and will be, immediately, irreparably, and significantly harmed by the Project.

25.     In addition to the immediate and irreparable injury to the environment and Plaintiffs' members uses of the public lands and nearby lands, Plaintiffs have been, and continue to be, injured by BLM's failure to conduct a proper review of the Project under NEPA and FLPMA.  BLM's legally inadequate EA, FONSI, and DR harms Plaintiffs' procedural rights to participate in a valid NEPA and FLPMA public process.

26.     A favorable ruling in this case would redress the harms that Plaintiffs and their members stand to suffer as a result of Defendants' actions.  If Defendants had properly considered the negative impacts of their actions on land, air quality, recreation, water resources, and wildlife they likely would not have authorized the Project, or would have considered only authorizing the exploration phase of the Project.  This would have prevented the diminishment of the enjoyment of public lands used by Plaintiffs and their members.  A favorable ruling would ensure that as Plaintiffs' members continue to use and enjoy public lands affected by Defendants' actions, their harms would be reduced, if not eliminated.

27.     Faced with BLM's actions and omissions authorizing the Project, and Plaintiffs' concrete and imminent injuries stemming from BLM's unlawful Project authorization, Plaintiffs now seek judicial review in this Court.

28.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States government responsible for the management and protection of the public lands at and around the Project site.  The BLM's Las Cruces District Office, District Manager WILLIAM CHILDRESS, and Assistant District Manager DAVID WALLACE, have direct responsibility for the public lands at and around the Project and are responsible for the decisions, actions and omissions in reviewing and approving the Project.  The named individuals are sued in their official capacities.

**STATUTORY AND REGULATORY BACKGROUND**

**Administrative Procedure Act**

29.     The APA provides a right to judicial review to any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.  Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*  Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)-(F).

**National Environmental Policy Act**

30.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.  NEPA recognizes that "each person should enjoy a healthful environment," and was enacted to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to

health or safety, or other undesirable and unintended consequences," among other policies. 42 U.S.C. § 4331(b).

31.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA which are binding on all federal agencies.  40 C.F.R. Part 1500.[1]

32.     BLM and the Department of the Interior have promulgated NEPA regulations, 43 C.F.R. Part 46, and policies, NEPA Handbook 1790-1, which are also binding upon BLM.

33.     NEPA regulations direct that "Agencies shall integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." 40 C.F.R. § 1501.2.

34.     NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before they act and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16.  By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

35.     NEPA requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §1500.1(b).

---

[1] The Council on Environmental Quality recently revised its national NEPA regulations, which become effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020).  Because BLM conducted its NEPA review for this project before the new regulations became effective, the CEQ NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part 1500, apply to the project and this Court's review.

36.     Under NEPA, BLM must consider (1) "the environmental impact of the proposed action," (2) "any adverse environmental impacts that cannot be avoided," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses .  . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332(2)(C).

37.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that may have a significant impact on the quality of the human environment. 42 U.S.C. § 4332.  An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

38.     An Environmental Assessment (EA) can be created to aid the agencies in determining whether or not a proposed activity may significantly affect the quality of the environment. 40 C.F.R. §§ 1501.4(b), 1508.9.

39.     An EA must include a full and adequate analysis of environmental impacts of a project and alternatives and must also include a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. *Id.* §§ 1508.7, 1508.8, 1508.9, 1508.25(c). An "effect" as used in NEPA and its implementing regulations "includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b).

40.     Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. §1508.8(a).  Indirect effects are caused by the action and are later in

11

time or farther removed in distance, but are still reasonably foreseeable. *Id*. §1508.8(b). Types of

impacts include "effects on natural resources and on the components, structures, and functioning

of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health

[effects]." *Id*.

41.     Cumulative effects/impacts are defined as:

> [T]he impact on the environment which results from the incremental impact of the action
> when added to other past, present, and reasonably foreseeable future actions regardless of
> what agency (Federal or non-Federal) or person undertakes such other actions.
> Cumulative impacts can result from individually minor but collectively significant
> actions taking place over a period of time.

40 C.F.R. § 1508.7.

42.     "A NEPA analysis requires the consideration of cumulative impacts in an EA."

*Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, 351 F.Supp.2d 1232, 1241 (D.

Wyoming 2005).  *See also Davis v. Mineta,* 302 F.3d 1104, 1125 (10th Cir.2002) ("The EA does

not provide an adequate discussion of the cumulative impacts of the Project on the human

environment.").

43.     As BLM's NEPA Policy Handbook states: "For an EA, we recommend that you

consider connected or cumulative actions in the same EA, and similar actions may be discussed

at your discretion.  Considering connected or cumulative actions in a single EA is particularly

important in the evaluation of significance…." National Environmental Policy Handbook, H-

1790-1, at 44.

44.     The Department of the Interior and BLM have adopted their own regulations to

supplement CEQ's NEPA regulations.  These supplemental regulations require consideration of

all reasonably foreseeable actions.  "*Reasonably foreseeable future actions* include those federal

and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible

Official of ordinary prudence would take such activities into account in reaching a decision." 43

C.F.R. § 46.30 (emphasis in original).

45.     An agency cannot defer conducting an analysis of foreseeable impacts by

asserting that the consequences are unclear or that the agency will analyze the impacts at a later

point in time if the agency is making an irretrievable commitment of resources. *New Mexico ex*

*rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009).

46.     The alternatives analysis is the heart of a NEPA document, and NEPA's

implementing regulations direct agencies to "[r]igorously explore and objectively evaluate all

reasonable alternatives." 40 C.F.R. § 1502.14(a).  The alternatives considered should include

those "that will avoid or minimize adverse effects of the actions upon the quality of the human

environment." *Id.* § 1500.2(e).

47.     In its alternatives' analysis, the agency must "present the environmental impacts

of the proposal and the alternatives in comparative form, thus sharply defining the issues and

providing a clear basis for choice among options by the decisionmaker and the public." *Id.* §

1502.14; *see also id.* § 1505.1(e).  This requires the agency to "[d]evote substantial treatment to

each alternative considered in detail . . . so that reviewers may evaluate their comparative

merits." *Id.* § 1502.14(b).

48.     BLM must "state how alternatives considered in it and decisions based on it will

or will not achieve the requirements of [NEPA] and other environmental laws and policies." 40

C.F.R. § 1502.2(d).  For alternatives that are excluded from agency analysis, the agency must

fully explain that decision. *Id.*

49.     BLM is also required to "describe the environment of the areas to be affected or

created by the alternatives under consideration."  40 C.F.R. § 1502.15.  The establishment of the

baseline conditions of the affected environment is a fundamental requirement of the NEPA process.

50.     NEPA also requires the BLM to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation.  NEPA regulations require that the agency's environmental review: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.16(h).  The BLM must fully evaluate the effectiveness and impacts of any mitigation measure it adopts or relies upon.

51.     "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981).

52.     NEPA requires that BLM review mitigation measures as part of the NEPA process - - not in some future decision shielded from public review. 40 C.F.R. § 1502.16(h).

**The Federal Land Policy and Management Act (FLPMA)**

53.     FLPMA requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  BLM cannot approve a mining plan of operations that would cause "unnecessary or undue degradation." 43 C.F.R. § 3809.411(d)(3)(iii).

14

54.     In addition, BLM must ensure that all operations comply with the Performance Standards found at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.5 (definition of UUD, specifying that failing to comply with the Performance Standards set forth at § 3809.420 constitutes UUD).

55.     The duty to "prevent undue degradation" is "the heart of FLPMA [that] amends and supercedes the Mining Law." *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 42 (D.D.C. 2003). "FLPMA, by its plain terms, vests the Secretary of the Interior [and the BLM] with the authority – indeed the obligation – to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land." *Id.*

56.     "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law." *Center for Biological Diversity v. Dept. of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010). BLM complies with this mandate "by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation." *Id.* at 645, *quoting Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 44 (D.D.C. 2003). *See also Kendall's Concerned Area Residents*, 129 IBLA 130, 138 (1994) ("If unnecessary or undue degradation cannot be prevented by mitigation measures, BLM is required to deny approval of the plan.").

57.     One of the required Performance Standards in Part 3809 mandates that all operations "must take mitigation measures specified by BLM to protect public lands." 43 C.F.R. § 3809.420(a)(4). According to the national policy of the Interior Department/BLM, failure to look at a range of alternatives to avoid significant impacts and failure to require mitigation that would reduce adverse Project impacts constitutes UUD. "Mitigation measures fall squarely within the actions the Secretary can direct to prevent unnecessary or undue degradation of the

public lands. *An impact that can be mitigated, but is not, is clearly unnecessary.*" 65 Fed. Reg.

69,998, 70,052 (Nov. 21, 2000) (preamble to BLM's 43 C.F.R. Part 3809 mining

regulations)(emphasis added).

## FACTUAL BACKGROUND

58.      BLM's EA summarized the initial permitting history of the Project:

American Magnesium submitted a PoO [Plan of Operation] for the proposed project. …
In April 2017, the proposed project was considered incomplete, and American
Magnesium updated the PoO in July 2017.  In December 2017, the BLM provided
comments on the revised PoO which detailed additional information required before the
PoO would be considered complete.  Between July 2018 and April 2019, American
Magnesium revised the PoO two additional times after BLM and MMD [New Mexico
Mineral and Mining Division] comments.

EA at 1.

59.      During the only public comment opportunity BLM provided for the proposed

Project, on June 16, 2020, Plaintiffs' counsel submitted a detailed comment letter to BLM on

behalf of all Plaintiff organizations, specifically noting the various legal and factual errors

contained in BLM's Draft EA for the Project.

60.      Despite widespread public opposition to the Project, including specific

submittals attesting to the fact that BLM failed to provide the required public review under

NEPA and FLPMA, BLM issued the EA and FONSI on July 31, 2020.  BLM then issued the DR

on August 7, which "authorize[d] the proposed action in the attached Environmental Assessment

(EA)." DR at 1.  The DR was immediately effective upon its issuance. DR at 11.

61.      The Project would lie at the western edge of the Florida Mountains, which are

located in Luna County approximately 12 miles southeast of Deming.  This mountain range is

characterized by spectacular jagged spires and multicolored cliffs of granite overlain in places by

limestone.  These rugged mountains rise more than 2,800 feet above the surrounding desert to an

elevation of 7,448 feet at Florida Peak, and dominate the landscape for miles around.  Gently

sloping alluvial fans radiate out from the higher terrain.

62.     In the EA, at 64, BLM acknowledged the area's irreplaceable natural features:

Outstanding Opportunities for Primitive and Unconfined Recreation

The Florida Mountains WSA offers a variety of outstanding primitive recreational
opportunities, including rock climbing, horseback riding, hunting, birding, photography
and other naturalist activities (BLM 1991). The Florida Mountains WSA contains rugged
mountains with steep ridges and canyons that offer opportunity for primitive and
unconfined recreation in addition to outstanding opportunity for solitude (BLM 1988).

63.     All of these public values would suffer during the 20 years of Project operations:

Outstanding opportunities for solitude would be impacted from the presence of the
proposed project and the large increase in transportation traffic heard and seen near the
western boundary of the Florida Mountains WSA.  In addition, outstanding opportunities
for solitude within the Florida Mountains WSA, including ridges and canyons, would
potentially be impacted when the proposed project is visible and blasting and operating
operations may be heard.
…
Impacts to solitude would occur along the west central portion of the WSA during normal
mine operation hours through the 20-year life of the mine.

EA at 66.

64.     In addition to the direct effects to the public lands at the site, the Project would

extensively impact the surrounding communities, especially due to the heavy industrial truck

traffic needed to transport the ore excavated from the open pit to AM's necessary

processing mill, as well as the pollution and other impacts from the mill itself.

65.     The EA contained a map showing the location of the mine and the "Conceptual

Mill Site" located just to the northwest of downtown Deming.  As shown on the map below, the

truck route (92 trips per day) between the mine and the mill would travel through Deming.  As

noted below, BLM failed to analyze the impacts on residential properties, schools, and

commercial interests in Deming and the surrounding area from this industrial traffic, let alone

conduct any serious analysis of the mill itself.  Because BLM's DR was immediately effective

upon issuance, DR at 11, Plaintiffs seek judicial review before this Court.



EA Figure 1.

**BLM's Review and Approval of the Project Violates FLPMA**

66.      The DR and Project approval authorizes both initial exploration as well as full-

scale open pit mining.  That is not permitted under FLPMA, NEPA, and BLM mining

regulations.  At most, BLM can only consider an alternative of authorizing the exploration aspect

of the Project to ascertain the nature and extent of the deposit. BLM cannot consider or approve

the open pit mineral extraction until the agency obtains that evidence.

67.     In a significant departure from accepted practice, BLM's DR  authorized AM's

Mining Plan of Operation (MPO) for full-scale mining before knowing anything about the

mineral resources at the site.

68.     According to AM:

There is insufficient information to estimate mineral resources for the deposit at this time
in accordance with Canadian Institute of Mining, Metallurgy and Petroleum (CIM)
Definition Standards for Mineral Resource and Mineral Reserves (CIM, 2014).  The total
thickness of the Fusselman Dolomite deposit in the Project Area (within AmMg's two
mining claims) is unknown at this time.  There is no vertical drill hole information for the
deposit.  All samples are surface chip only (see Section 6.2.1) and cannot be used to
verify the vertical and lateral continuity and grade of the dolomite.[2]

69.     There has been no drilling or exploration at the site (outside of some very limited

"chips" taken from the immediate surface).

70.     BLM cannot estimate mineral reserves or resources, approve products to be

mined, approve open pit operations, and anticipate and mitigate environmental problems and

approve a reclamation plan when it has little or no knowledge of the deposit to be mined.

71.     BLM mining regulations and policy mandate that BLM cannot approve full-scale

mining operations at the same time as the initial exploration, especially when so little is known

about the purported mineral deposit to be excavated.  Pursuant to its duty to "prevent

unnecessary or undue degradation" under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all

mineral operations follow the "performance standards" at 43 C.F.R. § 3809.420.  This includes

---

[2] AM's MPO at 32.  http://www.emnrd.state.nm.us/MMD/MARP/documents/2019-04-
09Revision4AmericanMagnesiumPlanofOperations_LU035MN.pdf, New Mexico Mining and
Minerals Division website, (viewed September 2, 2020).

the requirement that BLM review and approve operations in the logical sequence of operations –

where exploration is a prerequisite of actual mining/excavation/processing.

> *The operator must avoid unnecessary impacts and facilitate reclamation by*
> *following a reasonable and customary mineral exploration, development,*
> *mining, and reclamation sequence.* [citing 43 CFR 3809.420(a)(2).]
> This performance standard is designed to prevent unnecessary impacts from
> operations that are conducted out of sequence with the reasonable and customary
> mineral exploration, development, mining, and reclamation cycle. (*See also* 43
> CFR 3715.0-5, which defines "reasonably incident," in part as, "using methods,
> structures, and equipment appropriate to the geological terrain, mineral deposit,
> and *stage of development*" (emphasis added).).
>
> This standard is to be applied on a broad scale. For example, *an operation that*
> *proposes stripping soil from an area for mining purposes prior to even*
> *attempting to identify the presence of a mineral deposit using standard*
> *industry practices would not meet this performance standard.*[3]

72.     But that is what BLM approved here, AM's excavating/blasting of the full mine

pit "prior to even attempting to identify the presence of a mineral deposit using standard industry

practices."  Thus, BLM essentially admits that it "would not meet this performance standard." *Id*.

73.     Requiring exploration and mineral verification be completed first, before BLM

considers a Plan of Operations for full-scale actual mining, is certainly feasible in this case:

"RPA [AM's consultant] estimates that a diamond drilling program would yield sufficient

information to qualify the MgO grade in Dolomite Mountain.  A helicopter supported drill

program would have the least amount of surficial impact, should American Magnesium not wish

to pursue roads on the mountain at this stage of the evaluation."[4]

74.     Regarding the operations it authorized, BLM recognized that mitigation measures

are needed to protect the unique and valuable public resources at and adjacent to the site, such as

---

[3] BLM Minerals Handbook, Section H-3809-1, Surface Management, at 5-3 (emphasis added).
https://www.blm.gov/sites/blm.gov/files/H-3809-1.pdf (viewed September 2, 2020).
[4] Site Visit Report of Florida Mountains, New Mexico claims of American Magnesium LLLP, at
17 (2014)(submitted by Plaintiffs to BLM during comment period).

recreation/solitude, night skies, wildlife, and noise, especially due to the adjacent Florida

Mountains Wilderness Study Area and Area of Critical Environmental Concern.

75.     Accordingly, BLM stated that no operations should occur outside of daylight

hours, as the "project would only operate during daylight hours." EA at 9.  Mine operations

would be limited to 5 days a week. EA at 32.

76.     Despite acknowledging that the limit on hours and days of operation are needed to

mitigate damage and adverse impacts to critical resources, BLM failed to include these

mitigation requirements for the extensive road construction and drilling operations that would

precede full-scale mining.  As noted above, the failure to impose reasonable and necessary

mitigation measures constitutes UUD under FLPMA.

77.     BLM admits that it failed to review or require any details concerning the

necessary processing mill, stating that: "American Magnesium expects to identify a potential

processing facility site and apply for a permit to process the magnesium ore, in 2020.  One

conceptual mill site could be located on private land at the Peru Industrial Site [just north of

Deming]." EA at 22.  Yet BLM provides little to no analysis of other potential locations, routes,

their baseline conditions, or resulting impacts.

78.     Under BLM's Part 3809 mining regulations, 43 C.F.R. § 3809.401(b)(emphasis

added), FLPMA requires, as a condition for submittal of a complete Plan of Operations and

BLM's review/approval, detailed information including:

> (2) Description of Operations. A description of the equipment, devices, or practices you propose to use during operations including, where applicable.
> (i) Maps of the project area at an appropriate scale showing the location of exploration activities, drill sites, mining activities, *processing facilities*, waste rock and tailing disposal areas, *support facilities*, structures, buildings, and access routes;
> (ii) Preliminary or conceptual designs, cross sections, and operating plans for mining areas, *processing facilities*, and waste rock and tailing disposal facilities;
> (iii) Water management plans;

(iv) Rock characterization and handling plans;
(v) Quality assurance plans;
(vi) Spill contingency plans;
(vii) A general schedule of operations from start through closure; and
(viii) Plans for all access roads, water supply pipelines, and power or utility services[.]
(emphasis added).

79.    Because BLM approved the Project without the required designs and operating

plans for the processing mill and related facilities, the agency violated these FLPMA regulations,

as well as its duty to review the impacts from, and alternatives to, these operations.

80.    The fact that the necessary mill may not be on BLM-managed public land does

not mean that BLM can simply ignore its own requirements or fail to review the impacts from,

and alternatives to, the processing facilities.  BLM informed AM that the agency could not

conduct the required NEPA/FLPMA analysis, nor legally approve the mining plan under

FLPMA, without a detailed description of the processing plant operations.[5]

> Consistent with the surface management regulations at 43 C.F.R. 3809.411 (a), the
> BLM has reviewed the Plan for completeness relative to 43 C.F.R. 3809.40l(b).
> Based on our review, the following information is required in order for the Plan to be
> complete:
> …
> 11.   BLM comment 6 response states the Peru Industrial Site might be the
> location for ore processing.  *Before the BLM can issue a decision on the Plan, a
> definitive location must be determined in order for the BLM to complete a
> National Environmental Policy Act analysis on the Plan.*
>
> 12. BLM comment 7 response states that a Conceptual Feasibility of Magnesium
> Metal Complex near Deming, New Mexico report would be provided to give BLM
> details on how the ore will be processed . This report has not been provided to the
> BLM. *The BLM cannot determine if your Plan will cause unnecessary and undue
> degradation to public land without information about how the ore will be processed.*

81.    Outside of a vague "conceptual" mention of the possible site north of Deming,

and some generalized mention of potential processing methods, AM did not provide any of the

---

[5] BLM 12-8-17 letter to AM, at p. 2:
http://www.emnrd.state.nm.us/MMD/MARP/documents/120817BLMPOOReviewComments---
AmMgDolomite.pdf (viewed September 2, 2020)(emphasis added).

required details to BLM.  Yet BLM approved the full-scale mine anyway, in violation of its

duties to consider all aspects of the mining and processing under NEPA and FLPMA, and its

public resource protection duties under FLPMA.

82.     In addition to the NEPA discussion herein, a full review of direct, indirect and

cumulative impacts is also required by FLPMA's mandate that BLM take all measures to

"prevent unnecessary or undue degradation" of public resources.

83.     As held by the Interior Department's Board of Land Appeals in *Island Mountain*

*Protectors*, 144 IBLA 168, 202, 1998 WL 344223, * 28 (internal citations omitted, emphasis

added), failure to conduct a proper NEPA analysis, as detailed herein, violates not only NEPA,

but FLPMA and the UUD standard:

> Like NEPA, the [UUD] definition requires BLM to consider the nature and extent of
> surface disturbances resulting from a proposed operation and environmental impacts on
> resources and lands outside the area of operations. *Kendall's Concerned Area Residents*,
> 129 IBLA 130, 140-41 (1994); *Nez Perce Tribal Executive Committee*, 120 IBLA 34, 36
> (1991); see *Sierra Club v. Hodel*, 848 F.2d 1068, 1078, 1091 (10th Cir.1988)
> (nondegradation duty is mandatory). … [M]ost disturbed land at the mine sites is public
> land and other public land is adjacent to them. *To the extent BLM failed to meet its*
> *obligations under NEPA, it also failed to protect public lands from unnecessary or undue*
> *degradation.*

**BLM's Review and Approval of the Project Violates NEPA**

84.     Related to its truncated review of the Project under FLPMA, BLM also failed to

fully review the Project and take the required "hard look" at the baseline conditions that may be

affected by the Project, reasonable alternatives to the Project, mitigation measures, and all direct,

indirect, and cumulative impacts related to the Project.

85.     BLM failed to fully consider the cumulative impacts from all past, present, and

reasonably foreseeable future activities in the region on water quality and quantity, air quality,

recreation, cultural/religious, hunting opportunities, public safety, night skies, wildlife,

economic, scenic and visual resources, etc.  NEPA also requires the agency to fully review, and subject such review to public comment, the cumulative impacts from all other residential and commercial development, mining, grazing, recreation, energy development, roads, off-road vehicle use, etc., in the region.

86.     Regarding the processing mill and related facilities, BLM admits that the minerals have to be processed to produce a marketable product, and may be trucked to an industrial park north of Deming, yet BLM provides no details about these operations.  The EA lacks any analysis of the baseline environmental conditions in the processing area, the environmental impacts from this processing, or the truck traffic patterns to/from that plant or its impacts, among other impacts.

87.     For example, the potential truck route would pass through 3 school zones, yet BLM does not analyze the impacts to schools, child/parent transportation, and other safety issues.  The fact that other jurisdictions may have authority over schools does not eliminate BLM's duties to fully analyze these issues as part of the NEPA/FLPMA process, as they are directly connected and related to the operation of the mine.  This includes BLM's duties to analyze the public safety, economic, and other issues associated with the truck traffic through Deming, which BLM failed to do.

88.     Cumulative impacts must be reviewed "regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  For example, in considering a challenge to federal approval of mineral leasing and mining, the Colorado federal district court in *Colorado Environmental Coalition v. Office of Legacy Management*, 819 F.Supp.2d 1193, 1212 (D. Colo. 2011), required the agency to look at the impacts from the proposed mill that would process ore from mines/leases, despite the fact that the proposed mill

would be on private lands and despite the fact that the mill was not directly associated with the

mines/leases being proposed and was not included in the lease/mining proposals.  The court held:

> [The agency's] other two arguments—that the effects of the mill need not be
> evaluated because (1) it is being built by a company on private land, and (2)
> approval of the mill is controlled by other governmental entities—lack merit.
> Regardless of whether an EA or EIS is being prepared, the agency conducting the
> analysis must consider the "cumulative impacts" of the proposed action. …
>
> Nothing in this regulation suggests that ''cumulative impacts'' are limited to
> those occurring on [public] land, or that [the agency] need not consider the
> impacts from related activities that another federal agency is in charge of
> approving or disapproving.

89.     AM is on record stating that it has plans for:

> 10,000 tons/day would be produced from the quarry & conveyed 15 miles to the old
> ASARCO Mill site, the (fully permitted) Peru Mill Industrial Park where it would be
> processed and shipped to all parts of North America. … Several professional reports
> completed on this project are available to review, including a Scoping Study by The Tru-
> Group.[6]

90.     AM also touted its plans that its "Billion Dollar Facility would dominate the

North American Magnesium market producing 300,000 tons of Magnesium Metal a year

and millions of tons of Portland Cement from a billion ton high Magnesium Dolomite

Resource."[7]

91.     BLM never analyzed these larger operations, let alone any details of a processing

mill, in violation of NEPA and FLPMA.

92.     BLM also failed to review the direct, indirect, and cumulative impacts to other

critical resources from the Project.  As just one example, regarding water use and associated

impacts, BLM's EA shows that the Project's use of water in the Mimbres Basin will be

significant:

---

[6] AM graphic presentation (attached to Plaintiffs' comments to BLM).
[7] Executive Summary and Statement of David Q. Tognoni, Managing Member, American
Magnesium LLC (2016).

> The estimated daily water use will be 5,000 gallons, or as needed, for dust suppression, site reclamation activities, resource verification, and mining activities. The estimated daily water use for dust suppression along all roads including the access road, unnamed BLM road and County Road B016 is expected to require 28,000 gallons per day. The water used for dust suppression is expected to be sourced from a permittable source under the authority of the NMOSE [New Mexico Office of the State Engineer].

EA at 9-10.

93.     BLM does not provide any details about the impacts to ground-or surface water resources in the Mimbres Basin, as required by NEPA.  BLM also does not provide an analysis of the potentially additional sources of water, and impacts from removing/using that water, that will be needed for the mill/processing plant.

94.     BLM never inquired into where AM will obtain this critical water.  As such the EA is inadequate under NEPA and FLPMA, particularly given the legal restrictions on pumping or appropriating new sources of water in the Mimbres Basin.  BLM's omissions in the EA include the failure to analyze the impacts on water rights/uses that might be sold/transferred to AM for the mining/milling, including socioeconomic, environmental, cultural, and other current conditions and impacts.

95.     BLM did not analyze the Project's impacts on water, or analyze the baseline conditions of the water source(s).

96.     In addition, BLM did not analyze the air quality, transportation, safety, noise, and other impacts associated with the truck delivery traffic to/from the water source to the Project.

97.     Regarding air pollution, BLM failed to analyze all of the direct, indirect, and cumulative air emissions from the Project, limiting itself to mostly direct emissions of particulate emissions and greenhouse gases.  BLM did not analyze baseline conditions and potential impacts from other Criteria Pollutants under the federal Clean Air Act such as CO, VOCs, Ozone, $SO_2$, $NO_x$ – all pollutants that will be emitted from the exploration, mining, transportation, and

26

processing of the minerals.  This is true for the operations on BLM lands as well as the

processing operations and ore and product transport.

98.     Without an analysis of the airshed's baseline conditions and the Project's air

quality impacts for all Criteria Pollutants, BLM cannot ensure compliance with all state and

federal environmental standards, including standards for all Criteria Pollutants under the Clean

Air Act.

99.     BLM must ensure that all operations comply with the Performance Standards

found at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.5 (definition of UUD, specifying that

failing to comply with the Performance Standards set forth at § 3809.420 constitutes UUD).  One

of the most important Performance Standards requires BLM to ensure that all operations comply

with all environmental protection standards, including air and water quality standards.  *See, e.g.,*

43 C.F.R. § 3809.5 (definition of UUD includes "fail[ure] to comply with one or more of the

following: … Federal and state laws related to environmental protection."); § 3809.420

(b)(5)(listing Performance Standards that must be met, including the requirement that "All

operators shall comply with applicable Federal and state water quality standards …."). "All

operators shall comply with applicable Federal and state air quality standards, including the

Clean Air Act."  *Id*. § 3809.420(b)(4).

100.     BLM failed to fully analyze baseline conditions for all potentially affected

resources.  For example, regarding wildlife conditions, the EA states that:

> If surface disturbing activities must be implemented during the nesting season, a
> preconstruction survey for nesting migratory birds will be performed by a qualified
> wildlife biologist,[.]  If active nests are found, an appropriately-sized no surface
> disturbance buffer determined in coordination with the BLM biologist will be placed on
> the active nest until the nesting attempt has been completed.

EA at 18.

101.    Yet this "preconstruction survey for nesting migratory birds" should have been done during the NEPA process, subject to public review.  In addition, this post-approval decision process to determine "an appropriately-sized no disturbance buffer" is shielded from any public review in violation of NEPA and FLPMA.  BLM cannot rely on future mitigation measures to avoid collecting and analyzing the required baseline information/data now.

102.    "To avoid potential impacts to and unintentional take of migratory bird species, *a survey for nesting birds will be completed* to ensure that none are on the mine site." EA Section *2.1.7.7. Migratory Birds* (emphasis added).  This information on baseline conditions, as well as impacts and mitigation, must be obtained and analyzed during the NEPA process subject to full public review, not in the future.  In addition, the EA contains little to no information on baseline conditions for other critical wildlife species that may use the area such as quail and migratory sandhill cranes.

103.    In addition, for wildlife conditions and impacts, BLM only considered (albeit inadequately) the baseline conditions and impacts within the limited 40-acre "project area." *See* AM's Biological Evaluation at 3 (attached to AM's mining plan).  This limited analytical scope ignores the impacts from the transport and processing of the minerals as noted herein. NLM's limited analytical scope also ignores the obvious fact that impacts will be felt by wildlife outside the 40 acres (e.g., migration, travel, noise/air/visual/etc. impacts).

104.    BLM also failed to fully analyze mitigation measures and their effectiveness, as required by NEPA.  "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA.  Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

28

NEPA requires that the EA: "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f), and "include discussion of . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." §1502.16(h). "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." *South Fork Band Council v. Dept. of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). *See also Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, 351 F.Supp.2d 1232, 1252 (D. Wyoming 2005) (effectiveness of mitigation measures must be analyzed and supported by evidence in the record).

105.    Here, the EA contains little discussion of Project mitigation measures (e.g., air quality, water, wildlife, etc.), and no discussion about the effectiveness of any mitigation.  For example, the EA states that "American Magnesium will develop a written Stormwater Pollution Prevention Plan (SWPPP)." EA section *2.1.7.10. Water Quality* (EA at 19).  BLM has not provided an opportunity for public review of the to-be-developed SWPPP, in violation of NEPA.

106.    Further, as noted above, BLM mentioned mitigation measures related to limiting hours and days of operation for the open pit mine but did not consider or discuss similar mitigation limitations on the initial road construction and exploration drilling.

107.    For all of the NEPA violations discussed, a failure to conduct a NEPA-compliant EA renders the associated Finding of No Significant Impact (FONSI) necessarily inadequate and illegal under NEPA. *See Ctr. for Biological Diversity v. NHTSA*, 508 F.3d 1212, 1223-24 (9th Cir. 2007)(When an EA fails to comply with NEPA requirements, it "do[es] not constitute a 'hard look' at the environmental consequences of the action as required by NEPA. Thus, the FONSI is arbitrary and capricious.").

108.    To determine whether an EIS is needed, or that a FONSI can be supported by the record, the NEPA regulations include "significance" factors.  As long as one of the "significance" factors is present, the agency must prepare an EIS.  "If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken." *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340 (D.C. Cir. 2002) (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphases in original)).

109.    One of the "significance" factors is "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

110.    At a minimum, BLM cannot issue a FONSI when it has failed to analyze the impacts from the mill, infrastructure, and traffic/transport, where "it is reasonable to anticipate a cumulatively significant impact on the environment" from the combined impacts of these operations with the mine. *See also* 40 C.F.R. § 1508.27(b)(3)(significance may exist due to the "Unique characteristics of the geographic area such as proximity to … ecologically critical areas.").  This is especially true due to the Project's location near, and impacts to, the Florida Mountains WSA and ACEC.

111.    BLM also failed to fully consider all reasonable alternatives, including the alternative of considering and approving just the exploration, instead of both exploration and full-scale mining.

30

112.     NEPA requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E); *see also* 40 C.F.R. § 1508.9(b).  It must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a).

113.     In their EA comments, Plaintiffs specifically requested that BLM review the reasonable alternative that the agency only consider the exploration at this time.  Yet BLM refused, violating NEPA's requirement that BLM fully consider all "reasonable alternatives."

**FIRST CAUSE OF ACTION**

**Violation of FLPMA – Failure to Prevent Unnecessary or Undue Degradation
of Public Resources and Comply with Public Review Requirements**

114.     The allegations in the previous paragraphs are reasserted as if fully stated herein.

115.     Violations of FLPMA and NEPA, and their implementing regulations and policies, constitute "unnecessary or undue degradation" (UUD) that FLPMA prohibits.

116.     BLM's actions and omissions regarding its review and approval of the Project, violate FLPMA and its implementing regulations.

117.      BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**SECOND CAUSE OF ACTION**

**Violation of NEPA – Failure to Adequately Analyze Direct, Indirect, and
Cumulative Impacts**

118.     The allegations in the previous paragraphs are reasserted as if fully stated herein.

119.     BLM failed to adequately and accurately analyze the Project's direct, indirect and cumulative impacts to environmental and human resources, as required by NEPA.

120.     BLM's actions and omissions regarding its review and approval of the Project, violate NEPA and its implementing regulations.

121.     BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## THIRD CAUSE OF ACTION

### Violation of NEPA – Failure to Adequately Analyze Background/Baseline Conditions

122.     The allegations in the previous paragraphs are reasserted as if fully stated herein.

123.     BLM failed to adequately and accurately analyze the background/baseline conditions of resources that may be affected by the Project, as required by NEPA.

124.     BLM's actions and omissions regarding its review and approval of the Project, violate NEPA and its implementing regulations.

125.     BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## FOURTH CAUSE OF ACTION

### Violation of NEPA – Failure to Adequately Consider Reasonable Alternatives

126.     The allegations in the previous paragraphs are reasserted as if fully stated herein.

127.    BLM failed to adequately and accurately analyze reasonable alternatives as required by NEPA.

128.    BLM's actions and omissions regarding its review and approval of the Project, violate NEPA and its implementing regulations.

129.    BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## FIFTH CAUSE OF ACTION

**Violation of NEPA – Failure to Fully Analyze Mitigation Measures and Their Effectiveness**

130.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

131.    BLM failed to adequately and accurately analyze mitigation for the Project and to analyze the effectiveness of mitigation measures.

132.    BLM's actions and omissions regarding its review and approval of the Project, violate NEPA and its implementing regulations.

133.    BLM's actions and omissions in reviewing and approving the Project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court:

A.    Enter an order declaring that BLM's actions, omissions, and decisions reviewing and approving the Project violate NEPA, FLPMA, the APA, and their implementing regulations and policies;

B.    Pursuant to the APA, set aside and vacate the DR, EA, FONSI and Project approvals;

C.    Issue an immediate and permanent injunction prohibiting Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the Project, pending full compliance with the requirements of federal law;

D.    Issue an order granting Plaintiffs their costs and reasonable attorneys fees incurred in bringing this action, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. §2412 *et seq.*, and any other applicable statutory or equitable principles; and

E.    Issue an order granting such further relief this Court deems just and proper.


Respectfully submitted this 11th day of September, 2020.

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz (NM Bar # 23276)
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*/s/ Logan Glasenapp*
Logan Glasenapp (NM Bar # 148562)
NEW MEXICO WILDERNESS ALLIANCE
317 Commercial St. NE Ste. 300
Albuquerque, NM 87102
(505) 843-8696 ext. 103 (office)
logan@nmwild.org

*/s/ Roger Flynn*
Roger Flynn (Colorado Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org
(Appearing by association with Federal Bar member Samantha Ruscavage-Barz pursuant to L.R. 83.3(a))

*Attorneys for Plaintiffs*