## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| ) | Case No: 2:20-cv-924-JB-GBW |
| FRIENDS OF THE FLORIDAS; NEW MEXICO ) | |
| WILDERNESS ALLIANCE; WILDEARTH ) | |
| GUARDIANS; GILA RESOURCES ) | |
| INFORMATION PROJECT; AMIGOS BRAVOS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | FIRST AMENDED |
| ) | PETITION FOR REVIEW |
| vs. ) | OF AGENCY ACTION |
| ) | |
| UNITED STATES BUREAU OF LAND ) | |
| MANAGEMENT; WILLIAM CHILDRESS, ) | |
| District Manager of the BLM Las Cruces District ) | |
| Office; DAVID WALLACE, Assistant District ) | |
| Manager of the BLM Las Cruces District Office; ) | |
| ) | |
| Defendants, ) | |
| ) | |
| AMERICAN MAGNESIUM, LLC; ) | |
| ) | |
| Defendant-Intervenor-Applicant. ) | |
| ) | |

## INTRODUCTION AND PROCEDURAL SUMMARY

1.      Plaintiffs Friends of the Floridas, New Mexico Wilderness Alliance, WildEarth

Guardians, Gila Resources Information Project, and Amigos Bravos file this Amended Petition

for Review of Agency Action for vacatur, and equitable, declaratory and injunctive relief under

the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706; the Federal Land Policy

Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 *et seq.*; the National Environmental

Policy Act (NEPA), 42 U.S.C. §§ 4321 *et. seq.*; and their implementing regulations and policies.

2.     Plaintiffs challenge the actions of the United States Bureau of Land Management (BLM) in authorizing and approving the American Magnesium (AM) Foothill Dolomite Mine Project (mine or project) located on federal public lands managed by BLM near Deming, New Mexico, in violation of these laws, policies, and regulations.

3.     On August 7, 2020, the District Manager of BLM's Las Cruces District, Defendant William Childress, issued the Decision Record (2020 DR) authorizing the project. The 2020 DR was based on BLM's Environmental Assessment (EA) issued by the Las Cruces District in July of 2020.  The 2020 DR also relied on BLM's "Finding of No Significant Impact" (FONSI) issued on July 31, 2020 by the Assistant District Manager of the Las Cruces District, Defendant David Wallace.

4.     Plaintiffs filed their Petition for Review of Agency Action on September 11, 2020, challenging and seeking vacatur of the 2020 DR, EA, and FONSI. (ECF No. 1).

5.     On January 11, 2021, the Federal Defendants filed their "Unopposed Motion for Stay of All Proceedings." (ECF No. 13).  In that unopposed motion, the Federal Defendants stated: "BLM informed FOTF [Plaintiff Friends of the Floridas] that BLM intends to withdraw the challenged Decision and issue a new Decision Record for the Project in 2021." Id. at 2.

6.     "Federal Defendants agree that FOTF may file an Amended Petition to challenge the new Decision Record and related BLM actions/decisions within 30 days after the expiration of the stay.  BLM agrees to notify FOTF's counsel within three business days of the issuance of the new Decision Record, and provide the new Decision Record to FOTF's counsel within three business days.  BLM also agrees to notify FOTF's counsel within three business days once BLM has received and accepted AM's financial guarantee.  Upon issuance of the new Decision Record and filing of the Amended Petition, FOTF reserves the right to file any motion for Temporary

Restraining Order or Preliminary Injunction to block ground disturbance at the site pending this Court's review of the case on the merits." Id. at 3.

7.      This Court granted that motion to stay the case on January 15, 2021. ECF No. 14.

8.      On May 11, 2021, Defendant BLM District Manager William Childress issued a new Decision Record (2021 DR) for the Project.

https://eplanning.blm.gov/public_projects/1505404/200367902/20039278/250045473/American%20Magnesium%20DR%205-11-21.pdf

9.      On May 12, 2021, counsel for Federal Defendants notified counsel for Plaintiffs of the issuance of the 2021 DR.

10.     In response to a subsequent email inquiry from Plaintiffs' counsel, counsel for Federal Defendants stated that "BLM's position is that the new DR supersedes the August 2020 DR."

11.     In issuing the new 2021 DR, BLM continues to rely on BLM's July 2020 Environmental Assessment (EA) and FONSI for compliance with NEPA.  "This DR approves the construction, operation, and reclamation of the Project on public lands near Deming, New Mexico., as analyzed in the Environmental Assessment, DOI-BLM-NM-L000-2020-0024-EA (EA), dated July 2020.  This approval will take the form of an approved mining plan of operations." 2021 DR at 2.

12.     AM filed a series of Plans of Operations to BLM, the one submitted in August of 2018 is the one upon which the 2020 EA and now 2021 DR rely: "The complete Plan of Operations, including revisions made in March  2017, July 2017, February 2018, and August 2018 was used to develop the proposed action in the Environmental  Assessment." 2021 DR at 2.

13.     The 2021 DR notably contrasts with the 2020 DR.  The 2021 DR eliminates 5 pages of "Terms/Conditions/Stipulations" that were in the 2020 DR, including binding requirements regarding, *inter alia*, "Air Quality, Wildlife, Migratory Birds, Water Quality, and Reclamation and Revegetation." *See* 2020 DR at 1-6.  The 2020 DR had stated that these requirements were "a stipulation of this decision." 2020 DR at 1.

14.     But the new 2021 DR does not contain the previously-required protective stipulations (albeit inadequate as detailed in Plaintiffs' initial Petition), which, based on the EA, are now only essentially voluntary measures by AM.  Although the EA contains many, but not all, of the "Terms/Conditions/Stipulations" mandated and stipulated by the 2020 DR, the 2021 DR omits any mention of these stipulations and relies on the 2020 EA, which only states that AM would follow these "best management practices (BMPs) **wherever possible**." EA at 16 (emphasis added).

15.     This First Amended Petition for Review challenges the 2021 DR, the July 2020 EA and FONSI, and associated BLM project authorizations.

**THE FOOTHILLS MINE PROJECT AND ITS ADVERSE IMPACTS TO THE FLORIDA MOUNTAINS AND NEARBY COMMUNITIES**

16.     As approved by BLM in 2020 and again in the 2021 DR, the project would construct a new road across public land, conduct extensive exploration drilling, blast and excavate a large open pit, as well as develop additional infrastructure on public land.  Project operations would last 30 years and include 92 truck trips per day, passing through residential areas near Deming on their way to a necessary, but still unreviewed and never proposed, industrial processing mill.

17.     According to the 2021 DR: "Under the Proposed Action, American Magnesium would excavate dolomite in three phases, as described in the EA, with annual production of up to 300,000 tons of dolomite, containing magnesium, per year, with a projected mine life of 30 years. Operations would include blasting to loosen and break up the dolomite rock, on-site crushing, and staging and loading into haul trucks for transport to an off-site facility for further processing." 2021 DR at 3.  AM has never submitted, nor has BLM or the public ever seen, any proposal to permit this "off-site facility for further processing."

18.     "The Proposed Action also includes 1,334 feet of new access road, and 2 miles of improvement on an existing unnamed BLM road, and the construction of drill sites for resource verification drilling." Id.

19.     The project would lie at the western edge of the Florida Mountains, which are located in Luna County approximately 12 miles southeast of Deming.  This mountain range is characterized by spectacular jagged spires and multicolored cliffs of granite overlain in places by limestone.  These rugged mountains rise more than 2,800 feet above the surrounding desert to an elevation of 7,448 feet at Florida Peak, and dominate the landscape for miles around.  Gently sloping alluvial fans radiate out from the higher terrain.

20.     The following photo, taken in September 2020, shows the pristine environment and natural conditions at the site:

5



21.     The project is adjacent to the Florida Mountains Wilderness Study Area (WSA), and near the Florida Mountains Area of Critical Environmental Concern (ACEC).

22.     BLM designated the Florida Mountains WSA and ACEC to protect the significant scenic values, wildlife resources, biological systems including sensitive plant communities, and unique natural features of these lands.  WSAs like the Florida Mountains are areas of public land that the agency recognizes as suitable for inclusion in the National Wilderness Preservation System.

23.     According to BLM: "The Florida Mountains WSA also contains special features such as ecological and scenic features.  The WSA contains suitable habitat for a New Mexico State-listed species, night blooming cereus.  The peaks and slopes of the Florida Mountains

creates a high scenic quality within the WSA (BLM 1991). The higher elevations of the WSA contain steep, angular, red and gray rock outcroppings." EA at 64.

24.     Although the directly disturbed lands at the project site do not lie within the Florida Mountains ACEC and WSA, because of its close proximity to these protected lands, the project will result in direct and adverse impacts to wildlife, scenic beauty, and recreation in and around the ACEC and WSA. This is in addition to the significant impacts to the local communities that will be affected by the constant truck traffic to and from the project, as well as to the BLM-managed public lands at and around the project site itself.

25.     The Florida Mountains are known as a "sky island," and contain a diversity of habitats not found in the desert below. Coniferous woodland, mountains scrub (or chaparral), grasslands, and desert shrub and cactus plant communities comprise much of the vegetation. Small pockets of riparian areas are found around the numerous springs in the area. Canyons in the range direct rainfall into the closed drainage basin of the Mimbres River.

26.     The EA, at 64, acknowledged the irreplaceable natural features of the area:

Outstanding Opportunities for Primitive and Unconfined Recreation

The Florida Mountains WSA offers a variety of outstanding primitive recreational opportunities, including rock climbing, horseback riding, hunting, birding, photography and other naturalist activities (BLM 1991). The Florida Mountains WSA contains rugged mountains with steep ridges and canyons that offer opportunity for primitive and unconfined recreation in addition to outstanding opportunity for solitude (BLM 1988).

27.     All of these public values would suffer during the decades of project operations:

Outstanding opportunities for solitude would be impacted from the presence of the proposed project and the large increase in transportation traffic heard and seen near the western boundary of the Florida Mountains WSA. In addition, outstanding opportunities for solitude within the Florida Mountains WSA, including ridges and canyons, would potentially be impacted when the proposed project is visible and blasting and operating operations may be heard.
…

7

Impacts to solitude would occur along the west central portion of the WSA during normal mine operation hours through the 20-year life of the mine.

EA at 66.

28.     In addition to the direct effects to the public lands at the site, the project would inflict extensive impacts on the surrounding communities, especially due to the heavy industrial truck traffic needed to transport the ore excavated from the open pit to AM's necessary processing mill, as well as the pollution and other impacts from the mill itself.

29.     The EA contained the following map showing the location of the mine and the "Conceptual Mill Site" located just to the northwest of downtown Deming.  As shown on the map, the truck route (92 trips per day) between the mine and the mill would travel near or through Deming.  As noted below, BLM failed to analyze the impacts on residential properties, schools, and commercial interests in Deming and the surrounding area from this industrial traffic, let alone conduct any serious analysis of the mill itself.



EA Figure 1.

30.     During the only public comment opportunity provided by BLM on the proposed

project, in June of 2020, Plaintiffs submitted detailed comments to BLM, specifically noting the

various legal and factual errors contained in BLM's Draft EA for the project.

31.     Despite widespread public opposition to the project, including specific submittals

attesting to the fact that BLM failed to provide the required public review under NEPA and

FLPMA, BLM issued the EA and FONSI on July 31, 2020 and the subsequently-withdrawn

2020 DR on August 7, 2020, which "authorize[d] the proposed action in the attached

Environmental Assessment (EA)." 2020 DR at 1.

32.     Because BLM's 2020 DR, and now 2021 DR, were immediately effective upon

issuance, 2021 DR at 10, Plaintiffs seek judicial review before this Court.

## SUMMARY OF CLAIMS

33.     In reviewing and approving the project, BLM violated NEPA by failing to take

the required "hard look" at: (1) the Project's direct, indirect and cumulative impacts; (2) the

baseline conditions of the areas that may be affected by the Project; (3) mitigation measures that

would reduce Project impacts; and (4) reasonable alternatives to the Project.

34.     BLM approved both extensive exploration drilling (called "verification drilling"

in the 2021 DR, at 3) as well as the full-scale 30-year mine, yet admits that there is no plan or

proposal to process the excavated minerals from the mine.  BLM also admits that neither it nor

the company know the extent of the purported ore body, or even if the mine would be a going

concern.  In essence, BLM approved a full-scale mine with nowhere to go.  Such carte-blanche,

cart-before-the-horse decision making is not permitted under FLPMA and BLM mining

regulations, as well as NEPA.

35.     Under NEPA, BLM is obligated to fully consider all of the "direct, indirect, and cumulative impacts" from the mine as well as all "reasonably foreseeable future actions."  BLM admits that the processing mill is necessary, indeed there could be no viable mine without the mill, yet BLM's EA has no details about the mill, outside of a vague reference to a potential mill location on the north side of Deming.

36.     Regarding BLM's decision to approve 30 years of full-scale mining before exploration of the purported ore body has even occurred, BLM mining regulations and policy mandate that BLM cannot approve full mining before the initial exploration.  Pursuant to its duty to "prevent unnecessary or undue degradation" under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all mineral operations follow the "performance standards" at 43 CFR § 3809.420. This includes the requirement that BLM review and approve operations in the logical sequence of operations – where exploration is a prerequisite of actual mining, excavation, and processing.

37.     Plaintiffs had specifically requested that BLM review the reasonable alternative that BLM only consider the exploration at this time.  Yet BLM refused, violating NEPA's requirement that BLM fully consider all "reasonable alternatives."

38.     For these and the related reasons addressed herein, Plaintiffs ask this court to declare that BLM's actions violate the above-listed federal laws, regulations, and policies. Plaintiffs ask this court to vacate and remand BLM's decisions and enjoin any road construction, exploration, mining, and other project-related operations pending compliance with federal law.

## JURISDICTION AND VENUE

39.     This is a suit pursuant to the APA, FLPMA, NEPA, and the implementing regulations and policies of these laws.  Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), § 2201 (declaratory relief), and § 2202 (injunctive relief).

40.     Venue is properly before the District of New Mexico pursuant to 28 U.S.C. §§ 1391 (b) and (e).  The BLM Las Cruces District Office, and the named defendants are located in New Mexico.  The project is located in Luna County, New Mexico.  Plaintiffs' offices and members reside in New Mexico.

41.     The requested relief would redress Plaintiffs' actual, concrete injuries caused by the BLM's failure to comply with duties mandated by NEPA and FLPMA and their implementing regulations and policies.

42.     The challenged agency actions are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, & 706.

## PARTIES

43.     Plaintiff FRIENDS OF THE FLORIDAS (FOTF) is a nonprofit organization based in the Deming, New Mexico area whose mission is to protect the public lands in the Florida Mountains and nearby areas.  Friends was originally formed in the 1980s to support protection of the Florida Mountains and now responds to the environmental threats posed by the project.  Members of Friends use, enjoy, and value the lands and resources affected by the project, including the public lands and access roads at and around the project.  Friends members live in close proximity to the project and use on a daily basis the roads that the project will use. Members of Friends hike, view and photograph wild plant and animal life, and generally enjoy using the lands affected by the project for recreational, historical, conservation, and aesthetic purposes.  These uses will be immediately and irreparably affected by the direct and adverse impacts to Friends members resulting from the road construction, drilling, blasting, and other project operations.

44.     Plaintiff NEW MEXICO WILDERNESS ALLIANCE (NMWA) is a 501(c)(3) nonprofit organization based in Albuquerque, New Mexico, dedicated to the protection, restoration, and continued enjoyment of New Mexico's wildlands and wilderness areas, with thousands of members across the state.  The project at the base of the Florida Mountains will have significant detrimental effects on the nearby Wilderness Study Area and ACEC and will negatively impact NMWA and its members' ability to recreate and enjoy New Mexico's public lands in the area.  Members of NMWA use, enjoy, and value the lands and resources affected by the project, including the public lands and access roads at and around the project.  Members of NMWA hike, view and photograph wild plant and animal life, and generally enjoy using the lands around and affected by the project for recreational, historical, conservation, and aesthetic purposes.  These uses will be immediately and irreparably adversely affected by the project's road construction, drilling, blasting, and other operations.

45.     Plaintiff WILDEARTH GUARDIANS (Guardians) is a 501(c)(3) non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the West. Guardians has more than 200,000 members and activists, some of whom live, work, or recreate on public lands in the region where the project is located.  Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, and wild rivers of the American West.  Towards this end, Guardians and its members work to ensure that BLM complies with all federal laws when it authorizes projects like this one that can irreversibly damage federal public lands, wildlife, water, and air quality.  Guardians' members regularly use, and intend to continue using, public lands that are on, around, and/or within view of lands affected by the project for hiking, fishing, hunting, wildlife viewing, and aesthetic enjoyment.  Guardians' members' enjoyment of public lands in and adjacent to the project will be immediately, irreparably, and

adversely affected and diminished as a result of Defendants' actions.  The project stands to directly alter the natural state of public lands within and beyond the project area, produce air pollution that is offensive, create noise that disrupts wildlife and recreational enjoyment, and lead to connected development that will further adversely impact nearby public lands, including road construction, truck traffic, and the construction of processing facilities needed for the mine.

46.     Plaintiff GILA RESOURCES INFORMATION PROJECT (GRIP) is a New Mexico nonprofit membership organization, tax-exempt under section 501(c)(3), established in 1998, and based in Silver City, New Mexico.  GRIP has approximately 1000 members.  GRIP's mission is to promote community health by protecting the environment and natural resources of southwest New Mexico, including protecting surface water, groundwater, wildlife, and air quality.  Most GRIP members live in southwestern New Mexico, including areas in the vicinity of the proposed American Magnesium dolomite mine.  GRIP members use and enjoy the natural resources of southwest New Mexico, including the areas at and around the project site.  They use these areas for various forms of recreation, including birding, botanizing and wildflower viewing, hiking, and photography, all of which will be irreparably, immediately, and adversely affected by the mine project.

47.     Plaintiff AMIGOS BRAVOS is a state-wide New Mexico water conservation organization formed in 1988 and based in Taos, New Mexico.  It is a non-profit organization under section 501(c)(3) of the Internal Revenue Code.  Amigos Bravos is guided by social justice principles and dedicated to protecting and restoring the waters of New Mexico.  Since its formation Amigos Bravos has worked to ensure that New Mexico's mining laws protect clean water and the communities that depend on clean water for drinking, irrigation, recreation, and cultural traditions.  Amigos Bravos supporters use and enjoy the natural resources of southwest

14

New Mexico, including the areas at and around the site of the proposed mine.  They use these areas for various forms of recreation, including birding, botanizing and wildflower viewing, hiking, and photography, all of which will be irreparably, immediately, and adversely affected by the mine project.

48.     In addition to continuing to use and be adversely affected by the project, members of Plaintiff groups intend on continuing to use and value the lands at, and affected by, the project.  These uses are, and will be, immediately, irreparably, and significantly harmed by the project.

49.     In addition to the immediate and irreparable injury to the environment and Plaintiffs' members uses of the public lands and nearby lands, Plaintiffs have been, and continue to be, injured by BLM's failure to conduct a proper review of the project under NEPA and FLPMA.  BLM's legally inadequate EA, FONSI, and DR harms Plaintiffs' procedural rights to participate in a valid NEPA and FLPMA public process.

50.     A favorable ruling in this case would redress the harms that Plaintiffs and their members stand to suffer as a result of Defendants' actions.  If Defendants had properly considered the negative impacts of their actions on land, air quality, recreation, water resources, local communities, and wildlife they likely would not have authorized the project.  This would have prevented the diminishment of the enjoyment of public lands used by Plaintiffs and their members.  A favorable ruling would ensure that as Plaintiffs' members continue to use and enjoy public lands affected by Defendants' actions, their harms would be reduced, if not eliminated.

51.     Faced with BLM's actions and omissions authorizing the project, and Plaintiffs' concrete and imminent injuries stemming from BLM's unlawful project authorization, Plaintiffs now seek judicial review in this Court.

52.     Defendant BUREAU OF LAND MANAGEMENT is an agency of the United States government responsible for the management and protection of the public lands at and around the project site.  The BLM's Las Cruces District Office, District Manager WILLIAM CHILDRESS, and Assistant District Manager DAVID WALLACE, have direct responsibility for the public lands at and around the project and are responsible for the decisions, actions and omissions in reviewing and approving the project.  The named individuals are sued in their official capacities.

## STATUTORY AND REGULATORY BACKGROUND

**Administrative Procedure Act**

53.     The APA provides a right to judicial review to any "person suffering legal wrong because of agency action." 5 U.S.C. § 702.  Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.*  Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)-(F).

**National Environmental Policy Act**

54.     NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.  NEPA recognizes that "each person should enjoy a healthful environment," and was enacted to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to

health or safety, or other undesirable and unintended consequences," among other policies. 42
U.S.C. § 4331(b).

55.    The Council on Environmental Quality ("CEQ") promulgated uniform regulations
to implement NEPA which are binding on federal agencies. 40 C.F.R. Part 1500.[1]

56.    BLM and the Department of the Interior have promulgated NEPA regulations, 43
C.F.R. Part 46, and policies, NEPA Handbook 1790-1, which are also binding upon BLM.

57.    NEPA regulations direct that "Agencies shall integrate the NEPA process with
other planning at the earliest possible time to ensure that planning and decisions reflect
environmental values, to avoid delays later in the process, and to head off potential conflicts." 40
C.F.R. § 1501.2.

58.    NEPA's twin aims are to ensure that federal agencies take a hard look at the
environmental impacts of their proposed actions before they act and to ensure that agencies
provide relevant information to the public so the public can play a role in both the decision-
making process and the implementation of the decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§
1502.1, 1502.16.  By focusing the agency's attention on the environmental consequences of its
proposed action, NEPA ensures that important effects will not be overlooked or underestimated
only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

59.    NEPA requires that "environmental information is available to public officials
and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

---

[1] The Council on Environmental Quality revised its national NEPA regulations in 2020, which
became effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020).  Because
BLM conducted its NEPA review for this project before the new regulations became effective,
however, the CEQ NEPA regulations existing prior to September 14, 2020, at 40 C.F.R. Part
1500, apply to the project and this Court's review.

60.     Under NEPA, BLM must consider (1) "the environmental impact of the proposed action," (2) "any adverse environmental impacts that cannot be avoided," (3) "alternatives to the proposed action," (4) "the relationship between local short-term uses . . . and the maintenance and enhancement of long-term productivity," and (5) "any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332(2)(C).

61.     NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that may have a significant impact on the quality of the human environment. 42 U.S.C. § 4332.  An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

62.     An Environmental Assessment (EA) is created to aid the agencies in determining whether or not a proposed activity may significantly affect the quality of the environment. 40 C.F.R. §§ 1501.4(b), 1508.9.

63.     An EA must include a full and adequate analysis of environmental impacts of a project and alternatives and must also include a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. *Id.* §§ 1508.7, 1508.8, 1508.9, 1508.25(c). An "effect" as used in NEPA and its implementing regulations "includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b).

64.     Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. §1508.8(a).  Indirect effects are caused by the action and are later in

time or farther removed in distance, but are still reasonably foreseeable. *Id*. §1508.8(b). Types of

impacts include "effects on natural resources and on the components, structures, and functioning

of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health

[effects]." *Id*.

65.    Cumulative effects/impacts are defined as:

[T]he impact on the environment which results from the incremental impact of the action
when added to other past, present, and reasonably foreseeable future actions regardless of
what agency (Federal or non-Federal) or person undertakes such other actions.
Cumulative impacts can result from individually minor but collectively significant
actions taking place over a period of time.

40 C.F.R. § 1508.7.

66.    "A NEPA analysis requires the consideration of cumulative impacts in an EA."

*Wyoming Outdoor Council v. U.S. Army Corps of Engineers*, 351 F.Supp.2d 1232, 1241 (D.

Wyoming 2005). *See also Davis v. Mineta,* 302 F.3d 1104, 1125 (10th Cir.2002) ("The EA does

not provide an adequate discussion of the cumulative impacts of the Project on the human

environment.").

67.    As BLM's NEPA Policy Handbook states: "For an EA, we recommend that you

consider connected or cumulative actions in the same EA, and similar actions may be discussed

at your discretion.  Considering connected or cumulative actions in a single EA is particularly

important in the evaluation of significance…." National Environmental Policy Handbook, H-

1790-1, at 44.

https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_h179

0-1.pdf

68.    The Department of the Interior and BLM have adopted their own regulations to

supplement CEQ's NEPA regulations.  These supplemental regulations require consideration of

all reasonably foreseeable actions.   "*Reasonably foreseeable future actions* include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision." 43 C.F.R. § 46.30 (emphasis in original).

69.     An agency cannot defer conducting an analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time if the agency is making an irretrievable commitment of resources. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009).

70.     The alternatives analysis is the heart of a NEPA document, and NEPA's implementing regulations direct agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).  The alternatives considered should include those "that will avoid or minimize adverse effects of the actions upon the quality of the human environment." *Id.* § 1500.2(e).

71.     In its alternatives' analysis, the agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14; *see also id.* § 1505.1(e).  This requires the agency to "[d]evote substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits." *Id.* § 1502.14(b).

72.     BLM must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies." 40 C.F.R. § 1502.2(d).  For alternatives that are excluded from agency analysis, the agency must fully explain that decision. *Id.*

73.     BLM is also required to "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15.  The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process.

74.     NEPA also requires the BLM to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation.  NEPA regulations require that the agency's environmental review: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." 40 C.F.R. § 1502.16(h).  The BLM must fully evaluate the effectiveness and impacts of any mitigation measure it adopts or relies upon.

75.     "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981).

76.     NEPA requires that BLM review mitigation measures as part of the NEPA process - - not in some future decision shielded from public review. 40 C.F.R. § 1502.16(h).

**The Federal Land Policy and Management Act (FLPMA)**

77.     FLPMA requires that: "In managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  BLM cannot approve a mining plan of operations that would cause "unnecessary or undue degradation." 43 C.F.R. § 3809.411(d)(3)(iii) (BLM mining regulations).

78.     In addition, BLM must ensure that all operations comply with the Performance

Standards found at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.5 (definition of UUD, specifying

that failing to comply with the Performance Standards set forth at § 3809.420 constitutes UUD).

79.     The duty to "prevent undue degradation" is "the heart of FLPMA [that] amends

and supercedes the Mining Law." *Mineral Policy Center v. Norton*, 292 F.Supp.2d 30, 42

(D.D.C. 2003).  "FLPMA, by its plain terms, vests the Secretary of the Interior [and the BLM]

with the authority – indeed the obligation – to disapprove of an otherwise permissible mining

operation because the operation, though necessary for mining, would unduly harm or degrade the

public land." *Id.*

80.     "FLPMA's requirement that the Secretary prevent UUD supplements

requirements imposed by other federal laws and by state law." *Center for Biological Diversity v.*

*Dept. of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010).  BLM complies with this mandate "by

exercising case-by-case discretion to protect the environment through the process of: (1)

approving or rejecting individual mining plans of operation." *Id.* at 645, *quoting Mineral Policy*

*Center v. Norton*, 292 F.Supp.2d 30, 44 (D.D.C. 2003). *See also Kendall's Concerned Area*

*Residents*, 129 IBLA [Interior Dept. Board of Land Appeals] 130, 138 (1994) ("If unnecessary or

undue degradation cannot be prevented by mitigation measures, BLM is required to deny

approval of the plan.").

81.     One of the required Performance Standards in Part 3809 mandates that all

operations "must take mitigation measures specified by BLM to protect public lands." 43 C.F.R.

§ 3809.420(a)(4).  According to the national policy of the Interior Department/BLM, failure to

look at a range of alternatives to avoid significant impacts and failure to require mitigation that

would reduce adverse Project impacts constitutes UUD.  "Mitigation measures fall squarely

within the actions the Secretary can direct to prevent unnecessary or undue degradation of the

public lands. *An impact that can be mitigated, but is not, is clearly unnecessary.*" 65 Fed. Reg.

69,998, 70,052 (Nov. 21, 2000) (preamble to BLM's 43 C.F.R. Part 3809 mining

regulations)(emphasis added).

## BLM's Review and Approval of the Project Violates FLPMA

82.     The 2021 DR and project approval authorizes both initial exploration as well as

30 years of full-scale open pit mining.  At most, BLM can only consider an alternative of

authorizing the exploration aspect of the project to ascertain the nature and extent of the deposit,

and cannot consider or approve the open pit mineral extraction operations until the agency

obtains that evidence.  Such review and approval would be subject to FLPMA and NEPA.

83.     In a significant departure from accepted practice, BLM's 2021 DR authorized

AM's Mining Plan of Operation (MPO) for full-scale mining before knowing anything about the

mineral resources at the site.

84.     According to AM:

> There is insufficient information to estimate mineral resources for the deposit at this time
> in accordance with Canadian Institute of Mining, Metallurgy and Petroleum (CIM)
> Definition Standards for Mineral Resource and Mineral Reserves (CIM, 2014).  The total
> thickness of the Fusselman Dolomite deposit in the Project Area (within AmMg's two
> mining claims) is unknown at this time.  There is no vertical drill hole information for the
> deposit.  All samples are surface chip only (see Section 6.2.1) and cannot be used to
> verify the vertical and lateral continuity and grade of the dolomite.[2]

85.     Thus, there has been no drilling or exploration at the site (outside of some very

limited "chips" taken from the immediate surface).

---

[2] AM's 2019 MPO at 32 (PDF p. 57 of 363).
http://www.emnrd.state.nm.us/MMD/MARP/documents/2019-04-
09Revision4AmericanMagnesiumPlanofOperations_LU035MN.pdf, New Mexico Mining and
Minerals Division website, (last viewed May 29, 2021).

86.     BLM cannot estimate mineral reserves or resources, approve products to be mined and processed, approve open pit operations, and anticipate and mitigate environmental problems and approve a reclamation plan when it has little or no knowledge of the deposit to be mined.

87.     BLM mining regulations and policy mandate that BLM cannot approve full-scale mining operations at the same time as the initial exploration, especially when so little is known about the purported mineral deposit to be excavated.  Pursuant to its duty to "prevent unnecessary or undue degradation" under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all mineral operations follow the "performance standards" at 43 C.F.R. § 3809.420.  This includes the requirement that BLM review and approve operations in the logical sequence of operations – where exploration is a prerequisite of actual mining/excavation/processing.

> *The operator must avoid unnecessary impacts and facilitate reclamation by following a reasonable and customary mineral exploration, development, mining, and reclamation sequence.* [citing 43 CFR 3809.420(a)(2).] This performance standard is designed to prevent unnecessary impacts from operations that are conducted out of sequence with the reasonable and customary mineral exploration, development, mining, and reclamation cycle. (*See also* 43 CFR 3715.0-5, which defines "reasonably incident," in part as, "using methods, structures, and equipment appropriate to the geological terrain, mineral deposit, and *stage of development*" (emphasis added).).
>
> This standard is to be applied on a broad scale. For example, *an operation that proposes stripping soil from an area for mining purposes prior to even attempting to identify the presence of a mineral deposit using standard industry practices would not meet this performance standard.*[3]

88.     But that is what BLM approved here, AM's excavating/blasting of the full mine pit "prior to even attempting to identify the presence of a mineral deposit using standard industry practices."  Thus, BLM essentially admits that it "would not meet this performance standard." *Id*.

---

[3] BLM Minerals Handbook, Section H-3809-1, Surface Management, at 5-3 (PDF p. 93 of 361) (emphasis added). https://www.blm.gov/sites/blm.gov/files/H-3809-1.pdf (viewed May 29, 2021).

89.     Requiring exploration and mineral verification be completed first, before BLM considers a Plan of Operations for full-scale actual mining, is certainly feasible in this case: "RPA [AM's consultant] estimates that a diamond drilling program would yield sufficient information to qualify the MgO grade in Dolomite Mountain.  A helicopter supported drill program would have the least amount of surficial impact, should American Magnesium not wish to pursue roads on the mountain at this stage of the evaluation."[4]

90.     Regarding all the operations it authorized, BLM recognized that mitigation measures are needed to protect the unique and valuable public resources at and adjacent to the site, such as recreation/solitude, night skies, wildlife, and noise, especially due to the adjacent Florida Mountains Wilderness Study Area and the nearby Area of Critical Environmental Concern.

91.     Accordingly, BLM stated that no operations should occur outside of daylight hours, as the "project would only operate during daylight hours." EA at 9.  Mine operations would be limited to 5 days a week. EA at 32.

92.     Yet despite acknowledging that the limit on hours and days of operation are needed to mitigate damage and adverse impacts to critical resources, BLM failed to include these mitigation requirements for the extensive road construction and drilling operations that would precede full-scale mining.  Nor are they included in the 2021 DR.  As noted above, the failure to impose reasonable and necessary mitigation measures constitutes UUD under FLPMA.

93.     BLM admits that it failed to review or require any details concerning the necessary processing mill, stating that: "American Magnesium expects to identify a potential

---

[4] AM's consultant report, "Site Visit Report of Florida Mountains, New Mexico claims of American Magnesium LLLP," at 17 (2014)(submitted by Plaintiffs to BLM during comment period).

processing facility site and apply for a permit to process the magnesium ore, in 2020.  One conceptual mill site could be located on private land at the Peru Industrial Site [just north of Deming]." EA at 22.  Yet BLM provides little to no analysis of other potential locations, routes, their baseline conditions, or resulting impacts related to the processing mill.

94.     This issue was raised in Plaintiffs' comments to BLM in 2020, as well as in Plaintiffs' September, 2020 Petition to this Court.

95.     Yet as of June, 2021, AM has still not submitted **any** processing/milling proposal to either BLM or the New Mexico state agencies.

96.     Under BLM's Part 3809 mining regulations, 43 C.F.R. § 3809.401(b)(emphasis added), FLPMA requires, as a condition for submittal of a complete Plan of Operations and BLM's review/approval, detailed information including:

(2) Description of Operations. A description of the equipment, devices, or practices you propose to use during operations including, where applicable.
(i) Maps of the project area at an appropriate scale showing the location of exploration activities, drill sites, mining activities, *processing facilities*, waste rock and tailing disposal areas, *support facilities*, structures, buildings, and access routes;
(ii) Preliminary or conceptual designs, cross sections, and operating plans for mining areas, *processing facilities*, and waste rock and tailing disposal facilities;
(iii) Water management plans;
(iv) Rock characterization and handling plans;
(v) Quality assurance plans;
(vi) Spill contingency plans;
(vii) A general schedule of operations from start through closure; and
(viii) Plans for all access roads, water supply pipelines, and power or utility services[.] (emphasis added).

97.     Because BLM approved the project without the required designs and operating plans for the processing mill and related facilities, it violated these FLPMA regulations, as well as its duty to review the impacts from, and alternatives to, these operations.

98.     The fact that the necessary mill may not be on BLM-managed public land does not mean that BLM can simply ignore its own requirements or fail to review the impacts from, and alternatives to, the processing facilities.

99.     BLM had informed AM that the agency could not conduct the required NEPA/FLPMA analysis, nor legally approve the mining plan under FLPMA, without a detailed description of the processing plant operations.[5]

> Consistent with the surface management regulations at 43 C.F.R. 3809.411 (a), the BLM has reviewed the Plan for completeness relative to 43 C.F.R. 3809.40l(b). Based on our review, the following information is required in order for the Plan to be complete:
> …
> 11.   BLM comment 6 response states the Peru Industrial Site might be the location for ore processing. *Before the BLM can issue a decision on the Plan, a definitive location must be determined in order for the BLM to complete a National Environmental Policy Act analysis on the Plan.*
>
> 12. BLM comment 7 response states that a Conceptual Feasibility of Magnesium Metal Complex near Deming, New Mexico report would be provided to give BLM details on how the ore will be processed. This report has not been provided to the BLM. *The BLM cannot determine if your Plan will cause unnecessary and undue degradation to public land without information about how the ore will be processed.*

100.    Outside of a vague "conceptual" mention of the possible site north of Deming, and some generalized mention of potential processing methods, AM did not provide any of the required details to BLM.  Yet BLM approved the full-scale mine anyway, in violation of its duties to consider all aspects of the mining and processing under NEPA and FLPMA, and its public resource protection duties under FLPMA.

---

[5] BLM 12-8-17 letter to AM, at p. 1-2: http://www.emnrd.state.nm.us/MMD/MARP/documents/120817BLMPOOReviewComments---AmMgDolomite.pdf (last viewed May 29, 2021)(emphasis added).

101.    In addition to the NEPA discussion herein, a full review of direct, indirect and cumulative impacts is also required by FLPMA's mandate that BLM take all measures to "prevent unnecessary or undue degradation" of public resources.

102.    As held by the Interior Department's Board of Land Appeals,[6] failure to conduct a proper NEPA analysis, as detailed herein, violates not only NEPA, but FLPMA and the UUD standard:

> Like NEPA, the [UUD] definition requires BLM to consider the nature and extent of surface disturbances resulting from a proposed operation and environmental impacts on resources and lands outside the area of operations. *Kendall's Concerned Area Residents*, 129 IBLA 130, 140-41 (1994); *Nez Perce Tribal Executive Committee*, 120 IBLA 34, 36 (1991); see *Sierra Club v. Hodel*, 848 F.2d 1068, 1078, 1091 (10th Cir.1988) (nondegradation duty is mandatory). … [M]ost disturbed land at the mine sites is public land and other public land is adjacent to them. *To the extent BLM failed to meet its obligations under NEPA, it also failed to protect public lands from unnecessary or undue degradation.*

## BLM's Review and Approval of the Project Violates NEPA

103.    Related to its truncated review of the project under FLPMA, BLM also failed to fully review the project and take the required "hard look" at the baseline conditions that may be affected by the project, reasonable alternatives to the project, mitigation measures, and all direct, indirect, and cumulative impacts related to the project.

104.    BLM failed to fully consider the cumulative impacts from all past, present, and reasonably foreseeable future activities in the region on water quality and quantity, air quality, recreation, cultural/religious, hunting opportunities, public safety, night skies, wildlife, economic, scenic and visual resources, etc.  NEPA also requires the agency to fully review, and subject such review to public comment, the cumulative impacts from all other residential and

---

[6] *Island Mountain Protectors*, 144 IBLA 168, 202, 1998 WL 344223, * 28 (internal citations omitted, emphasis added).

commercial development, mining, grazing, recreation, energy development, roads, off-road vehicle use, etc., in the region.

105.   Regarding the processing mill and related facilities, BLM admits that the minerals have to be processed to produce a marketable product, and may be trucked to an industrial park north of Deming, yet BLM provides no details about these operations.  The EA lacks any analysis of the baseline environmental conditions in the processing area, the environmental impacts from this processing, or the truck traffic patterns to/from that plant or its impacts, among other impacts.

106.   For example, a potential truck route may pass through residential school zones, yet BLM does not analyze the impacts to schools, child/parent transportation, and other safety issues.  The fact that other jurisdictions may have authority over schools does not eliminate BLM's duties to fully analyze these issues as part of the NEPA/FLPMA process, as they are directly connected and related to the operation of the mine.  This includes BLM's duties to analyze the public safety, economic, and other issues associated with the truck traffic, which BLM failed to do.

107.   Cumulative impacts must be reviewed "regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.  For example, in considering a challenge to federal approval of mineral leasing and mining, the Colorado federal district court required the agency to look at the impacts from the proposed mill that would process ore from mines/leases, despite the fact that the proposed mill would be on private lands and despite the fact that the mill was not directly associated with the mines/leases being proposed and was not included in the lease/mining proposals.  The court held:

> [The agency's] other two arguments—that the effects of the mill need not be
> evaluated because (1) it is being built by a company on private land, and (2)

approval of the mill is controlled by other governmental entities—lack merit. Regardless of whether an EA or EIS is being prepared, the agency conducting the analysis must consider the "cumulative impacts" of the proposed action. …

Nothing in this regulation suggests that ''cumulative impacts'' are limited to those occurring on [public] land, or that [the agency] need not consider the impacts from related activities that another federal agency is in charge of approving or disapproving.

*Colorado Environmental Coalition v. Office of Legacy Management*, 819 F.Supp.2d 1193, 1212

(D. Colo. 2011).

108.    AM is on record stating that it has plans for:

10,000 tons/day would be produced from the quarry & conveyed 15 miles to the old ASARCO Mill site, the (fully permitted) Peru Mill Industrial Park where it would be processed and shipped to all parts of North America. … Several professional reports completed on this project are available to review, including a Scoping Study by The Tru-Group.[7]

109.    AM also touted its plans that its "Billion Dollar Facility would dominate the North American Magnesium market producing 300,000 tons of Magnesium Metal a year and millions of tons of Portland Cement from a billion ton high Magnesium Dolomite Resource."[8]

110.    BLM never analyzed these larger operations, let alone any details of a processing mill, in violation of NEPA and FLPMA.  As noted above, this is despite BLM's statements to AM requiring the company to submit these plans so that BLM could fulfill its FLPMA and NEPA responsibilities. *See* BLM 12-8-17 letter to AM, at p. 1-2.

111.    BLM also failed to review the direct, indirect, and cumulative impacts to other critical resources from the project.  As just one example, regarding water use and associated

---

[7] AM graphic presentation (attached to Plaintiffs' comments to BLM).

[8] Executive Summary and Statement of David Q. Tognoni, Managing Member, American Magnesium LLC (2016).

impacts, BLM's EA shows that the project's use of water in the Mimbres Basin will be

significant:

> The estimated daily water use will be 5,000 gallons, or as needed, for dust suppression, site reclamation activities, resource verification, and mining activities. The estimated daily water use for dust suppression along all roads including the access road, unnamed BLM road and County Road B016 is expected to require 28,000 gallons per day. The water used for dust suppression is expected to be sourced from a permittable source under the authority of the NMOSE [New Mexico Office of the State Engineer].

EA at 9-10.

112.    No details about the impacts to the water resources of the ground and surface

waters in the Mimbres Basin is provided, as required by NEPA.  Nor is there an analysis of the

potentially additional sources of water, and impacts from removing/using that water, that will be

needed for the mill/processing plant.

113.    BLM never inquired into where AM will obtain this critical water.  As such the

EA is inadequate under NEPA and FLPMA, particularly given the legal restrictions on pumping

or appropriating new sources of water in the Mimbres Basin.  This includes the failure to analyze

the impacts on water rights/uses that might be sold/transferred to AM for the mining/milling,

including socioeconomic, environmental, cultural, and other current conditions and impacts.

114.    BLM did not analyze the project's full impacts on water, or analyze the baseline

conditions of the water source(s).

115.    In addition, BLM did not analyze the air quality, transportation, safety, noise, and

other impacts associated with the truck delivery traffic to/from the water source to the project.

116.    Regarding air pollution, BLM failed to analyze all of the direct, indirect, and

cumulative air emissions from the project, limiting itself to mostly direct emissions of particulate

emissions and greenhouse gases.  BLM did not analyze baseline conditions and potential impacts

from other Criteria Pollutants under the federal Clean Air Act such as CO, VOCs, Ozone, SO2,

NOx – all pollutants that will be emitted from the exploration, mining, transportation, and processing of the minerals.  This is true for the operations on BLM lands as well as the connected processing operations and ore and product transport.

117.    Without an analysis of the airshed's baseline conditions and the project's air quality impacts for all Criteria Pollutants, BLM cannot ensure compliance with all state and federal environmental standards, including standards for all Criteria Pollutants under the Clean Air Act.

118.    BLM must ensure that all operations comply with the Performance Standards found at 43 C.F.R. § 3809.420. *See* 43 C.F.R. §3809.5 (definition of UUD, specifying that failing to comply with the Performance Standards set forth at §3809.420 constitutes UUD).  One of the most important Performance Standards requires BLM to ensure that all operations comply with all environmental protection standards, including air and water quality standards.  *See, e.g.,* 43 C.F.R. § 3809.5 (definition of UUD includes "fail[ure] to comply with one or more of the following: … Federal and state laws related to environmental protection."); § 3809.420 (b)(5)(listing Performance Standards that must be met, including the requirement that "All operators shall comply with applicable Federal and state water quality standards …."). "All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act."  *Id*. § 3809.420(b)(4).

119.    BLM failed to fully analyze baseline conditions for all potentially affected resources.  For example, regarding wildlife conditions, the EA states that:

> If surface disturbing activities must be implemented during the nesting season, a preconstruction survey for nesting migratory birds will be performed by a qualified wildlife biologist,[.]  If active nests are found, an appropriately-sized no surface disturbance buffer determined in coordination with the BLM biologist will be placed on the active nest until the nesting attempt has been completed.

EA at 18.

120.    Yet this "preconstruction survey for nesting migratory birds" should have been done during the NEPA process, subject to public review.  In addition, this post-approval decision process to determine "an appropriately-sized no disturbance buffer" is shielded from any public review in violation of NEPA and FLPMA.  BLM cannot rely on future mitigation measures to avoid collecting and analyzing the required baseline information/data.

121.    "To avoid potential impacts to and unintentional take of migratory bird species, *a survey for nesting birds will be completed* to ensure that none are on the mine site." EA Section *2.1.7.7. Migratory Birds* (emphasis added).  This information on baseline conditions, as well as impacts and mitigation, must be obtained and analyzed during the NEPA process subject to full public review, not in the future.  In addition, the EA contains little to no information on baseline conditions on other critical wildlife species that may use the area such as quail and migratory sandhill cranes.

122.    In addition, for wildlife conditions and impacts, BLM only considered (albeit inadequately) the baseline conditions and impacts within the limited 40-acre "project area." *See* AM's Biological Evaluation at 3 (attached to AM's mining plan).  Not only does this ignore the impacts from the transport and processing of the minerals as noted herein, but the obvious fact that impacts will be felt by wildlife outside the 40 acres (e.g., migration, travel, noise/air/visual/etc. impacts).

123.    BLM also failed to fully analyze mitigation measures and their effectiveness, as required by NEPA.  "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA.  Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of

the adverse effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

NEPA requires that the EA: "include appropriate mitigation measures not already included in the

proposed action or alternatives," 40 C.F.R. §1502.14(f), and "include discussion of . . . Means to

mitigate adverse environmental impacts (if not already covered under 1502.14(f))." §1502.16(h).

"An essential component of a reasonably complete mitigation discussion is an assessment of

whether the proposed mitigation measures can be effective." *South Fork Band Council v. Dept.

of Interior*, 588 F.3d 718, 727 (9th Cir. 2009). *See also Wyoming Outdoor Council v. U.S. Army

Corps of Engineers*, 351 F.Supp.2d 1232, 1252 (D. Wyoming 2005) (effectiveness of mitigation

measures must be analyzed and supported by evidence in the record).

124.    Here, the EA contains little discussion of project mitigation measures (e.g., air

quality, water, wildlife, etc.), and no discussion about the effectiveness of any mitigation.  For

example, the EA states that "American Magnesium will develop a written Stormwater Pollution

Prevention Plan (SWPPP)." EA section *2.1.7.10. Water Quality* (EA at 19).  BLM has not

provided an opportunity for public review of the to-be-developed SWPPP, in violation of NEPA.

125.    Further, as noted above, BLM mentioned mitigation measures related to limiting

hours and days of operation for the open pit mine but omitted any discussion of similar

mitigation limitations on the initial road construction and exploration drilling.

126.    For all of the NEPA violations discussed, a failure to conduct a NEPA-compliant

EA renders the associated Finding of No Significant Impact (FONSI) necessarily inadequate and

illegal under NEPA. *See Ctr. for Biological Diversity v. NHTSA*, 508 F.3d 1212, 1223-24 (9th

Cir. 2007)(When an EA fails to comply with NEPA requirements, it "do[es] not constitute a

'hard look' at the environmental consequences of the action as required by NEPA. Thus, the

FONSI is arbitrary and capricious.").

127.    To determine whether an EIS is needed, or that a FONSI can be supported by the record, the NEPA regulations include "significance" factors.  As long as one of the "significance" factors is present, the agency must prepare an EIS.  "If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* agency action is taken." *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 340 (D.C. Cir. 2002) (citing *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphases in original).

128.    One of the "significance" factors is "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

129.    At a minimum, BLM cannot issue a FONSI when it has failed to analyze the impacts from the mill, infrastructure, and traffic/transport, where "it is reasonable to anticipate a cumulatively significant impact on the environment" from the combined impacts of these operations with the mine. *See also* 40 C.F.R. § 1508.27(b)(3)(significance may exist due to the "Unique characteristics of the geographic area such as proximity to … ecologically critical areas.").  This is especially true due to the Project's location near, and impacts to, the Florida Mountains WSA and ACEC.

130.    BLM also failed to fully consider all reasonable alternatives, including the alternative of considering and approving just the exploration, instead of both exploration and full-scale mining.

131.     NEPA requires the agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E); *see also* 40 C.F.R. § 1508.9(b).  It must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a).

132.     In their EA comments, Plaintiffs specifically requested that BLM review the reasonable alternative that the agency only consider the exploration at this time.  Yet BLM refused, violating NEPA's requirement that BLM fully consider all "reasonable alternatives."

## FIRST CAUSE OF ACTION

### Violation of FLPMA – Failure to Prevent Unnecessary or Undue Degradation of Public Land Resources and Comply with Public Review Requirements

133.     The allegations in the previous paragraphs are reasserted as if fully stated herein.

134.     Violations of FLPMA and NEPA, and their implementing regulations and policies, constitute "unnecessary or undue degradation" (UUD) that FLPMA prohibits.

135.     BLM's actions and omissions regarding its review and approval of the project, violate FLPMA and its implementing regulations.

136.      BLM's actions and omissions in reviewing and approving the project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**SECOND CAUSE OF ACTION**

**Violation of NEPA – Failure to Adequately Analyze Direct, Indirect, and
Cumulative Impacts**

137.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

138.    BLM failed to adequately and accurately analyze the project's direct, indirect
and cumulative impacts to environmental and human resources, as required by NEPA.

139.    BLM's actions and omissions regarding its review and approval of the project,
violate NEPA and its implementing regulations.

140.    BLM's actions and omissions in reviewing and approving the project are
arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of
procedure required by law, and in excess of statutory jurisdiction, authority, or limitations,
within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**THIRD CAUSE OF ACTION**

**Violation of NEPA – Failure to Adequately Analyze Background/Baseline Conditions**

141.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

142.    BLM failed to adequately and accurately analyze the background/baseline
conditions of resources that may be affected by the project, as required by NEPA.

143.    BLM's actions and omissions regarding its review and approval of the project,
violate NEPA and its implementing regulations.

144.    BLM's actions and omissions in reviewing and approving the project are
arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of
procedure required by law, and in excess of statutory jurisdiction, authority, or limitations,
within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**FOURTH CAUSE OF ACTION**

**Violation of NEPA – Failure to Adequately Consider Reasonable Alternatives**

145.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

146.    BLM failed to adequately and accurately analyze reasonable alternatives as required by NEPA.

147.    BLM's actions and omissions regarding its review and approval of the project, violate NEPA and its implementing regulations.

148.    BLM's actions and omissions in reviewing and approving the project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

**FIFTH CAUSE OF ACTION**

**Violation of NEPA – Failure to Fully Analyze Mitigation Measures and Their Effectiveness**

149.    The allegations in the previous paragraphs are reasserted as if fully stated herein.

150.    BLM failed to adequately and accurately analyze mitigation for the project and to analyze the effectiveness of mitigation measures.

151.    BLM's actions and omissions regarding its review and approval of the project, violate NEPA and its implementing regulations.

152.    BLM's actions and omissions in reviewing and approving the project are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the judicial review provisions of the APA. 5 U.S.C. §§ 701-706.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court:

A.     Enter an order declaring that BLM's actions, omissions, and decisions reviewing and approving the project violate NEPA, FLPMA, the APA, and their implementing regulations and policies;

B.     Pursuant to the APA, Set Aside and Vacate the 2021 DR, the 2020 EA, 2020 FONSI, and project approvals;

C.     Issue an immediate and permanent injunction prohibiting Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the project, pending full compliance with the requirements of federal law;

D.     Issue an order granting Plaintiffs their costs and reasonable attorneys fees incurred in bringing this action, pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. §2412 *et seq.*, and any other applicable statutory or equitable principles; and

E.     Issue an order granting such further relief this Court deems just and proper.

Respectfully submitted this 9th day of June, 2021.

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz (NM Bar # 23276)
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*/s/ Logan Glasenapp*
Logan Glasenapp (NM Bar # 148562)
NEW MEXICO WILDERNESS ALLIANCE
317 Commercial St. NE Ste. 300
Albuquerque, NM 87102

(505) 843-8696 ext. 103 (office)
logan@nmwild.org

*/s/ Roger Flynn*
Roger Flynn (Colorado Bar # 21078)(Appearing by association with Federal Bar member
Samantha Ruscavage-Barz pursuant to L.R. 83.3(a))
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

Attorneys for Plaintiffs

### Certificate of Service

I, Samantha Ruscavage-Barz, hereby attest that I served all parties in this case with the foregoing, by submitting it via this Court's ECF filing system, this 9th day of June, 2021.

*/s/ Samantha Ruscavage-Barz*