# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| FRIENDS OF THE FLORIDAS; NEW MEXICO WILDERNESS ALLIANCE; WILDEARTH GUARDIANS; GILA RESOURCES INFORMATION PROJECT; AMIGOS BRAVOS; | ) ) ) ) ) | Case No.: 2:20-cv-00924-JB-GBW |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| UNITED STATES BUREAU OF LAND MANAGEMENT; *et al*.; | ) ) ) | |
| Defendants. | ) ) | |
| AMERCIAN MAGNESIUM; | ) ) | |
| Defendant-Intervenor. | ) ) | |

## PLAINTIFFS' OPENING BRIEF ON THE MERITS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iii

LIST OF EXHIBITS ......................................................................................................viii

FACTUAL AND PROCEDURAL BACKGROUND ...............................................................1

I.      The Foothills Mine Project and Its Adverse Impacts to the Florida
        Mountains and Nearby Communities. ..............................................................1

II.     Procedural Background and Case History.................................................................7

PLAINTIFFS' STANDING ...............................................................................................9

STANDARD OF REVIEW................................................................................................11

ARGUMENT.................................................................................................................12

I.      BLM Violated NEPA. .........................................................................................13

A.      Statutory and Regulatory Background.................................................................13

B.      BLM's Review and Approval of the Project Violates NEPA. ................................18

        1.      BLM Failed to Analyze the Impacts from the Project's Processing Mill. ..........18

        2.      BLM Failed to Consider and Analyze All Reasonable Alternatives. .................25

        3.      Failure to Analyze Baseline Conditions of the Affected Areas. ..........................27

II.     BLM Violated FLPMA. .......................................................................................30

A.      Statutory and Regulatory Background.................................................................30

B.      BLM's Review and Approval of the Project Violates FLPMA. ...............................30

        1.      BLM Erroneously Approved Both the Initial Exploration and Full Mine
                at the Same Time. ..........................................................................................30

        2.      BLM Approved the Project Without Knowing Critical Details about
                the Project's Processing Mill and its Impacts. ..................................................35

III.    Due to BLM's Substantial Legal Errors, and the Impending Damage to
        Public Land and Resources from the Project, This Court Should Vacate
        BLM's Approval and Review Decisions. ...........................................................37

A.      The APA Generally Requires Vacatur of Unlawful Agency Actions. ...........................37

B.      Vacatur is Warranted Under the *Allied-Signal* Test.  .....................................38

        1.      *BLM's NEPA and FLPMA Violations are Serious.*  ..............................38

        2.      *The Disruptive Impact of Vacatur is Limited and Does Not Outweigh*
                *Harm to Plaintiffs*  ................................................39

## TABLE OF AUTHORITIES

### *Federal Caselaw*

*Allied-Signal v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) ........................................................38, 39

*Ayers v. Espy*,
873 F. Supp. 455 (D. Colo. 1994) ........................................................26

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) ........................................................14

*Biodiversity Conservation All. v. U.S. Forest Serv.*,
765 F.3d 1264 (10th Cir. 2014) ........................................................16

*Camp v. Pitts*,
411 U.S. 138 (1973) ........................................................37

*Ctr. for Biological Diversity v. Dep't of the Interior*,
623 F.3d 633 (9th Cir. 2010) ........................................................23, 30, 34, 36

*Ctr. for Biological Diversity v. NHTSA*,
508 F.3d 508 (9th Cir. 2007) ........................................................17

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ........................................................17, 24

*Ctr. for Biological Diversity v. U.S. BLM*,
2023 WL 387609, No. 4:21-cv-00182-BLW (D. Idaho Jan. 24, 2023) ................................23

*Citizens for a Healthy Community v. BLM*,
377 F. Supp. 3d 1223 (D. Colo. 2019) ........................................................19

*Ctr. for Native Ecosystems v. Salazar*,
795 F. Supp. 2d 1236 (D. Colo. 2011) ........................................................39

*Colo. Envtl. Coal. v. Dombeck*,
185 F.3d 1162 (10th Cir. 1999) ................................................................11, 14, 18

*Colo. Envtl Coal. v. Office of Legacy Mgmt.*,
819 F. Supp. 2d 1193 (D. Colo. 2011) ......................................................24

*Colo. Envtl. Coal. v. Salazar*,
875 F. Supp.2d 1233 (D. Colo. 2012) .......................................................19

*Colo. Wild Horse & Burro Coal., Inc. v. Jewell*,
130 F. Supp. 3d 205 (D.D.C. 2015) .........................................................18

*Comm. to Save Rio Hondo v. Lucero*,
102 F.3d 445 (10th Cir. 1996) ................................................................10, 11

*Diné CARE v. OSMRE*,
No. 12-cv-01275—JLK, 2015 WL 1593995 (D. Colo. April 6, 2015) ................37

*Diné Citizens Against Ruining Our Env't v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019) ...............................................................37

*Dine Citizens Against Ruining Our Env't v. Haaland*,
--- F.4th ---, 2023 WL 1430620 (10th Cir. Feb. 1, 2023) ...............................19, 38

*Diné Citizens Against Ruining Our Environment v. Jewell*,
312 F.Supp.3d 1031 (D.N.M. 2018) ........................................................37

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) ..............................................................14, 15

*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
451 F.3d 1183 (10th Cir. 2006) ..............................................................13

*F.C.C. v. Nextwave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003) ...........................................................................37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) ...........................................................................9

*Gifford Pinchot Task Force v. Perez*,
2014 WL 3019165 (D. Or. 2014) ...........................................................28

*Grand Canyon Trust v. F.A.A.*,
290 F.3d 339 (D.C. Cir. 2002) ...............................................................23

*Great Basin Res. Watch v. BLM*,
844 F.3d 1095 (9th Cir. 2016) ...............................................................22

iv

*Greater Yellowstone Coal. v. Flowers,*
359 F.3d 1257 (10th Cir. 2004) ..................................................................................12, 14

*Half Moon Bay Fisherman's Mktg. Ass'n v. Carlucci,*
857 F.2d 505 (9th Cir. 1988) ...............................................................................16

*High Country Conservation Advocates v. U.S. Forest Serv.,*
951 F.3d 1217 (10th Cir. 2020) ...........................................................................37

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .............................................................................................9

*Mineral Policy Ctr. v. Norton,*
292 F. Supp. 2d 30 (D.D.C. 2003) .......................................................................30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...............................................................................................11

*Nat'l Women's Law Ctr. v. OMB,*
358 F. Supp. 3d 66 (D.C. Cir. 2019) ....................................................................38

*N.M. ex rel. Richardson v. BLM,*
565 F.3d 683 (10th Cir. 2009) ...............................................................11, 13, 18, 19, 20

*N.M. Health Connections v. U. S. Dept. of Health & Human Srvs.,*
340 F. Supp. 3d 1112 (D.N.M. 2018) ...................................................................37

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,*
668 F.3d 1067 (9th Cir. 2011) .............................................................................28

*Olenhouse v. Commodity Credit Corp.,*
42 F.3d 1560 (10th Cir. 1994) .............................................................................11

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency,*
806 F.3d 520 (9th Cir. 2015) ...............................................................................39

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) .............................................................................................14

*Rocky Mountain Wild v. Dallas,*
2022 WL 11733139, Civ. No. 19-cv-01512-CMA (D. Colo. 2022) .....................39

*San Juan Citizens All. v. Stiles,*
654 F.3d 1038 (10th Cir. 2011) ...........................................................................19

*Sierra Club v. Hodel,*
848 F.2d 1068 (10th Cir.1988) ............................................................................36

*Sierra Club v. U.S. Dep't of Energy*,
287 F.3d 1256 (10th Cir. 2002) ................................................................9

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ...........................................................23, 24

*S. Utah Wilderness All. v. Palma*,
707 F.3d 1143 (10th Cir. 2013) ............................................................10

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................38, 39

*Taxpayers of Mich. Against Casinos v. Norton*,
433 F.3d 852 (D.C. Cir. 2006) ..............................................................19

*Utah Shared Access All. v. U.S. Forest Serv.*,
288 F.3d 1205 (10th Cir. 2002) ............................................................14

*Utahns for Better Transp. v. U.S. Dept. of Trans.*,
305 F.3d 1152 (10th Cir. 2002) .................................................19, 27, 29

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
870 F.3d 1222 (10th Cir. 2017) ............................................................37

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
457 F.Supp. 3d 880 (D. Mont. 2020) .................................................38, 39

*Wyoming v. U.S.*,
279 F.3d 1214 (10th Cir. 2002) ............................................................11

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*,
351 F. Supp. 2d 1232 (D. Wyo. 2005) ..................................................19

## *Federal Statutes*

Administrative Procedure Act (APA),
5 U.S.C. § 706 ...................................................................................12

Surface Resources Act of 1955,
30 U.S.C. §612...............................................................................32, 33

Federal Land Policy and Management Act (FLPMA),
43 U.S.C. §§ 1701 *et seq* ....................................................................12

Federal Land Policy and Management Act (FLPMA),
43 U.S.C. §§ 1732 .............................................................13, 30, 31, 32

National Environmental Policy Act (NEPA),
42 U.S.C. §§ 4321 *et. seq*............................................................................................12

National Environmental Policy Act (NEPA),
42 U.S.C. § 4321............................................................................................................13

National Environmental Policy Act (NEPA),
42 U.S.C. § 4331....................................................................................................13, 14

National Environmental Policy Act (NEPA),
42 U.S.C. § 4332....................................................................................14, 15, 16, 26

## *Federal Regulations*

40 C.F.R. Part 1500.......................................................................................................14

40 C.F.R. § 1500.1 .........................................................................................................15

40 C.F.R. 1500.2 ....................................................................................................16, 17

40 C.F.R. § 1501.4 .........................................................................................................15

40 C.F.R. § 1502.2 .........................................................................................................15

40 C.F.R. § 1502.14 .............................................................................16, 17, 26, 27

40 C.F.R. § 1502.15 .....................................................................................16, 27

40 C.F.R. § 1502.16 .......................................................................................................17

40 C.F.R. § 1505.1 .........................................................................................................17

40 C.F.R. § 1508.7 ...........................................................................15, 16, 18, 23

40 C.F.R. § 1508.8 ...................................................................................15, 16

40 C.F.R. § 1508.9 ..........................................................................15, 16, 26

40 C.F.R. § 1508.14 .......................................................................................................16

40 C.F.R. § 1508.25 .......................................................................................................15

40 C.F.R. § 1508.27 ...........................................................................23, 24, 25

43 C.F.R. Part 46............................................................................................................15

43 C.F.R. § 46.30............................................................................................................20

43 C.F.R. § 3715.0-5 ................................................................................31, 32, 33

43 C.F.R. § 3809.5 ...........................................................................................30, 32

43 C.F.R. § 3809.401 ...........................................................................23, 30, 34, 35

43 C.F.R. § 3809.411 ....................................................................................................31

43 CFR § 3809.420 ........................................................................13, 30, 31, 32


***Additional Authority***

85 Fed. Reg. 43304-43376 (July 16, 2020) .............................................................14

BLM Minerals Handbook, Section H-3809-1, Surface Management ........................31, 32, 33

*Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981) ......................................17

*Great Basin Mine Watch*,
146 I.B.L.A. 248, 256 (1998) ..........................................................................23, 34

*Island Mountain Protectors*,
144 IBLA 168, 1998 WL 344223 (1998) .......................................................29, 36

*Kendall's Concerned Area Residents*,
129 IBLA 130, 140-41 (1994) .......................................................................................36

*Nez Perce Tribal Executive Committee*,
120 IBLA 34, 36 (1991) ...............................................................................................36

## Exhibit List for Plaintiffs' Opening Brief on the Merits

1.     Declaration of Light
2.     Declaration of Pattison
3.     Declaration of Siwik
4.     Declaration of Zupan
5.     Declaration of Berman
6.     Interior Secretary Order # 3399
7.     June 27, 2017 BLM Email and Memorandum
8.     June 28, 2017 BLM Email
9.     June 29, 2017 BLM Email
10.    July 17, 2017 BLM Email
11.    August 9, 2019 BLM Information/Briefing Memorandum
12.    BLM Minerals Handbook, H-3809-1 (Excerpts)

Plaintiffs Friends of the Floridas (FOF), New Mexico Wilderness Alliance (NMWA), WildEarth Guardians (Guardians), Gila Resources Information Project (GRIP), and Amigos Bravos (AB), file this Opening Brief on the merits, asking this Court to hold unlawful and vacate the review and approval by Federal Defendants, Bureau of Land Management (BLM) *et al*., of the Foothills Dolomite Mine Project (Project or project), proposed by Defendant-Intervenor American Magnesium Inc. (AM), on BLM-managed federal public lands south of Deming, New Mexico.

Plaintiffs challenge the BLM's 2021 Decision Record (2021 DR) which approved the Project, AR 000114-124, along with BLM's underlying Environmental Assessment (EA), AR 000014-000099, and Finding of No Significant Impact (FONSI), AR 000002-000013.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      The Foothills Mine Project and Its Adverse Impacts to the Florida Mountains and Nearby Communities.**

The Project would conduct extensive exploration drilling, blast and excavate a large open mine pit, build a new road across public land, and construct and operate additional industrial infrastructure on public land in the Florida Mountains south of Deming and at an as-yet unidentified processing facility north of the town.

Before any mining begins, the 2021 DR authorized AM to conduct an extensive "resource verification drilling" (i.e. mineral exploration) program to determine the nature of the dolomite ore body.  Over 80 drill holes are planned. AM Plan of Operations (Mar. 2017, Rev. Sept. 2018)(hereinafter AM 2018 PoO), at 8, AR 0005011 (map of drill sites); *see* id. at 7-10, AR 00005010-5013 (describing drilling operation).

_____

[1] "AR" refers to pages of the Administrative Record (described at the bottom of each page as AR_AmMag_#######), including the supplemental documents recently filed by BLM. Doc. 45 (January 11, 2023).

For the mining plan approved by BLM,

American Magnesium would excavate dolomite in three phases, as described in the EA, with annual production of up to 300,000 tons of dolomite, containing magnesium, per year, with a projected mine life of 30 years. Operations would include blasting to loosen and break up the dolomite rock, on-site crushing, and staging and loading into haul trucks for transport to an off-site facility for further processing.

2021 DR at 3, AR 0000116. AM never submitted an application or plan for this "off-site facility for further processing."

During mining operations, 92 daily haul trucks tips are planned ("46 round trips per day") to run through rural neighborhoods and then through Deming. EA at 21, AR 0000037. "[T]he average number of round trips per year would be approximately 12,000" (24,000 trips/yr.). Id. "The Proposed Action also includes 1,334 feet of new access road, and 2 miles of improvement on an existing unnamed BLM road, and the construction of drill sites for resource verification drilling." 2021 DR at 3, AR 0000116.

The project would lie at the western edge of the Florida Mountains, which are located in Luna County approximately 12 miles southeast of Deming. This mountain range is characterized by spectacular jagged spires and multicolored cliffs of granite overlain in places by limestone. These rugged mountains rise more than 2,800 feet above the surrounding desert to an elevation of 7,448 feet at Florida Peak and dominate the landscape for miles around. Gently sloping alluvial fans radiate out from the higher terrain.

The following photo, taken in September 2020 and included in Plaintiffs' Amended Petition/Complaint (Doc. 18 at 6), shows the pristine environment and natural conditions around the site:

2



The project is adjacent to the BLM-designated Florida Mountains Wilderness Study Area (WSA), and near the Florida Mountains Area of Critical Environmental Concern (ACEC). BLM designated the Florida Mountains WSA and ACEC to protect the significant scenic values, wildlife resources, biological systems including sensitive plant communities, and unique natural features of these lands. WSAs like the Florida Mountains are areas of public land that the agency recognizes as suitable for inclusion in the National Wilderness Preservation System. According to BLM,

> The Florida Mountains WSA also contains special features such as ecological and scenic features. The WSA contains suitable habitat for a New Mexico State-listed species, night blooming cereus. The peaks and slopes of the Florida Mountains creates a high scenic quality within the WSA (BLM 1991). The higher elevations of the WSA contain steep, angular, red and gray rock outcroppings.

EA at 64, AR 0000080; *see also* EA at 65 (Figure 5), AR 0000081 (showing Project location adjacent to the WSA). The Florida Mountains are known as a "sky island" and contain a diversity of habitats not found in the desert below. Coniferous woodland, mountains scrub (or chaparral), grasslands, and desert shrub and cactus plant communities comprise much of the vegetation. Small

pockets of riparian areas are found around the numerous springs in the area. Canyons in the range direct rainfall into the closed drainage basin of the Mimbres River.

Although the directly disturbed public lands at the Project site do not lie within the Florida Mountains ACEC and WSA, because of its close proximity to these protected lands, the Project will result in direct and adverse impacts to wildlife, scenic beauty, and recreation in and around the ACEC and WSA. This is in addition to the significant impacts to the local communities that will be affected by the industrial truck traffic to and from the project, as well as to the BLM-managed public lands at and around the Project site itself.

BLM highlighted the irreplaceable natural features of the area:

Outstanding Opportunities for Primitive and Unconfined Recreation

> The Florida Mountains WSA offers a variety of outstanding primitive recreational opportunities, including rock climbing, horseback riding, hunting, birding, photography and other naturalist activities (BLM 1991). The Florida Mountains WSA contains rugged mountains with steep ridges and canyons that offer opportunity for primitive and unconfined recreation in addition to outstanding opportunity for solitude (BLM 1988).

EA at 64, AR 0000080. BLM acknowledged that these public values would suffer during the decades of project operations:

> Outstanding opportunities for solitude would be impacted from the presence of the proposed project and the large increase in transportation traffic heard and seen near the western boundary of the Florida Mountains WSA. In addition, outstanding opportunities for solitude within the Florida Mountains WSA, including ridges and canyons, would potentially be impacted when the proposed project is visible and blasting and operating operations may be heard.
> …
> Impacts to solitude would occur along the west central portion of the WSA during normal mine operation hours through the 20-year[2] life of the mine.

EA at 66, AR 0000082.

---

[2] Although the EA analyzed impacts for a project lifespan of only 20 years, the DR reflects "a projected mine life of 30 years." 2021 DR at 3, AR 0000116.

In addition to the direct effects to the public lands at the site, the project would inflict extensive impacts on the surrounding communities, especially due to the heavy industrial truck traffic needed to transport the ore excavated from the open pit to AM's necessary processing mill, as well as the pollution, water usage, and other impacts from the mill itself.

The EA contained the following map, showing the location of the mine and the "Conceptual Mill Site" located just to the northwest of downtown Deming.  As shown on the map, the truck route (24,000 trips per year) between the mine and the mill would travel near and through Deming.



EA Figure 1, AR 0000018.

II.     **Procedural Background and Case History.**

On August 7, 2020, the District Manager of BLM's Las Cruces District, Defendant William Childress, issued the initial Decision Record (2020 DR) authorizing the Project. AR 00000100-112. The 2020 DR was based on BLM's Environmental Assessment (EA) issued by the Las Cruces District in July of 2020. AR 00000014.  The 2020 DR also relied on BLM's "Finding of No Significant Impact" (FONSI) issued on July 31, 2020 by the Assistant District Manager of the Las Cruces District, Defendant David Wallace. AR 0000002-13.

Plaintiffs filed their Petition for Review of Agency Action with this Court on September 11, 2020, challenging and seeking vacatur of the 2020 DR, EA, and FONSI. (Doc. 1).  On January 11, 2021, BLM filed a motion stating that the agency had decided to withdraw the decision underlying Plaintiffs' lawsuit and requested a stay. (Doc. 13).  "BLM informed [Plaintiffs] that BLM intend[ed] to withdraw the challenged Decision and issue a new Decision Record for the Project in 2021." *Id.* at 2.  "Federal Defendants agree[d] that [Plaintiffs] may file an Amended Petition to challenge the new Decision Record and related BLM actions/decisions within 30 days after the expiration of the stay." *Id.* at 3.  This Court granted that motion to stay the case on January 15, 2021. (Doc. 14).

On May 11, 2021, Defendant BLM District Manager William Childress issued a new Decision Record (2021 DR) for the Project, which superseded the 2020 DR. AR 00000114-124. Plaintiffs filed their Amended Petition/Complaint on June 9, 2021. (Doc. 18).

In issuing the new 2021 DR, BLM relied on BLM's July 2020 EA and FONSI for compliance with NEPA, stating, "This DR approves the construction, operation, and reclamation of the Project on public lands near Deming, New Mexico[,] as analyzed in the Environmental Assessment, DOI-BLM-NM-L000-2020-0024-EA (EA), dated July 2020.  This approval will take the form of an approved mining plan of operations." 2021 DR at 2, AR 00000115.

Before BLM prepared the EA for the Project, AM submitted a series of Plans of Operations to BLM.  Following multiple revisions, the BLM determined that the Plan of Operations revision dated September 2018 met the content requirements of the BLM's mining regulations and deemed that version of the plan administratively complete. BLM 10-12-18 letter to AM, AR 00005415.  The September 2018 plan is the one upon which BLM's 2020 EA and 2021 DR are based.[3]  After public review was completed, AM submitted additional revised versions of the Plan of Operations. *See* AM Plan of Operations (Aug. 27, 2020 (Rev. 5)) (hereinafter AM Revised 2020 PoO), AR 00005631-6050.

After Plaintiffs filed the Amended Petition/Complaint, BLM submitted what it purported to be a complete Administrative Record.  BLM refused to disclose hundreds of documents, and thousands of pages, which it asserted were "deliberative" documents that the agency did not have to produce to this Court and the parties.  Plaintiffs filed a motion challenging BLM's refusal to produce a complete administrative record. (Doc. 26).  This Court held oral argument on Plaintiffs' motion on July 6, 2022.

This Court issued its ruling on the motion, granting in part and denying in part Plaintiffs' motion on September 29, 2022. (Doc. 42).  The Court ordered Federal Defendants to create a log of documents withheld from the Administrative Record and ordered the parties to work to resolve any disputes regarding the withheld documents. (Doc. 42 at 1-2).  Federal Defendants submitted the log on September 9, 2022. (Doc. 41).

---

[3] The 2021 DR states, "The complete Plan of Operations, including revisions made in March 2017, July 2017, February 2018, and August 2018 was used to develop the proposed action in the Environmental Assessment." 2021 DR at 2, AR 00000115.  The record does not, however, include a plan revision dated August 2018. The record does include a plan revision dated July 2018, *see* AR 00004788-4987, and a plan revision dated September 2018, *see* AR 00004997-5199, 00005207-5409. It appears to Plaintiffs that the 2021 DR and 2020 EA are based on September 2018 revision, which is the version that BLM accepted as administratively complete.

After reviewing BLM's log, and the agency's decision to still exclude thousands of pages of documents from this Court's review, Plaintiffs' counsel informed BLM counsel of their objection to these continued omissions.  After numerous emails, BLM agreed to provide the large majority of previously withheld documents to this Court and for the parties' use.  Per the agreement amongst the parties, BLM stipulated that:

> Federal Defendants will supplement the Administrative Record with 40 documents from the log and will file a notice certifying the complete Administrative Record by January 13, 2023. All documents in the completed Administrative Record will be produced in pdf format and served on the Parties and lodged with the Court on a computer thumbdrive.

> Federal Defendants have disclosed to the parties all documents on the log not subject to privilege (and excluding documents that Plaintiffs do not dispute). Plaintiffs have stated they do not intend to seek production of documents identified as privileged.

> For documents that were disclosed to the parties but not supplemented to the Administrative Record, Federal Defendants stipulate that any party may rely on and include such documents as extra-record materials in support of their briefing on the merits.

Joint Stipulation on the Administrative Record, January 10, 2023. (Doc. 44, at 2).  This Court approved the Joint Stipulation on February 6, 2023. (Doc. 46).  As detailed below, a number of these previously-withheld BLM documents support Plaintiffs' claims on the merits and are attached as Exhibits.

## PLAINTIFFS' STANDING

Plaintiffs have standing to sue because their members have suffered, and will continue to suffer, injuries in fact that are fairly traceable to, and would thus be redressed by invalidation of, BLM actions in this case. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-181, 183 (2000); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1264-65 (10th Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

For injury-in-fact, Plaintiffs must show that (1) "in making its decision without following [NEPA's] procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm," and (2) "the increased risk of environmental harm injures [Plaintiffs' members'] concrete interests by demonstrating either [their] geographical nexus to, or actual use of the site of the agency action." *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996). Plaintiffs need not show their members have "traversed each bit of land that will be affected by a challenged agency action." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1155 (10th Cir. 2013). Rather, it is sufficient for members to specify areas they have visited, aver that these specific areas will be affected by the Project, and state that their interests will be harmed by such activity. *Id*. at 1156.

Plaintiffs' members are directly harmed by BLM's decision approving the Project. The mine, drilling, road construction and traffic, mill, and associated infrastructure would adversely affect the lands where Plaintiffs' members have enjoyed, and intend to continue enjoying in the coming months and years, a variety of activities including camping, hiking, photographing natural desert beauty, appreciating the solitude and peace and quiet of the affected lands, and viewing wildlife in the area. These uses will be immediately and significantly harmed by the Project and related operations. *See* Declarations of Light (Exhibit 1), Pattison (Exhibit 2), Siwik (Exhibit 3), Zupan (Exhibit 4), Berman (Exhibit 5). These Declarations also show how BLM violated Plaintiffs' procedural rights to participate in proper NEPA and FLPMA reviews.

To establish traceability in NEPA cases, a "plaintiff need only trace the risk of harm to the agency's alleged failure to follow [NEPA's] procedures." *Lucero*, 102 F.3d at 452. Here, Plaintiffs' members' injuries can be traced to BLM's failure to take a hard look at the Project's impacts to the landscape, air, wildlife, and other affected resources.

Finally, Plaintiffs' members' injuries would be redressed by a favorable decision because, in addition to preventing the Project's impacts to Plaintiffs' members, BLM would be made to properly analyze the full impacts of the Project under NEPA and FLPMA, and provide additional opportunities for public involvement in its decisionmaking process.  This analysis could lead to denial of the Project, or to modifications that would lessen the Project's environmental impacts.  A favorable decision would thus "avert the possibility that [BLM] may have overlooked significant environmental consequences of its action," thereby redressing Plaintiffs' alleged harms.  *See Lucero*, 102 F.2d at 452.

## STANDARD OF REVIEW

The violations of NEPA and FLPMA at issue here are reviewed under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).  A court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] … (D) without observance of procedures required by law." *Id.*  This Court reviews BLM decisions "under 5 U.S.C. § 706(2)(A) to determine, de novo, whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (additional citations omitted).  This review requires a "thorough, probing, and in-depth review" of the administrative record. *Wyoming v. U.S.*, 279 F.3d 1214, 1238 (10th Cir. 2002).

This Court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.  In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir.

11

2009) (same) (*Richardson*).  This standard of review also applies to BLM's issuance of its Finding of

No Significant Impact (FONSI). *Greater Yellowstone Coal. v. Flowers,* 359 F.3d 1257, 1274 (10th

Cir. 2004).

## **ARGUMENT**

BLM's review and approval of the Project violates the National Environmental Policy Act

(NEPA), 42 U.S.C. §§ 4321 *et. seq.*; the Federal Land Policy Management Act of 1976 (FLPMA),

43 U.S.C. §§ 1701 *et seq.*; and their implementing regulations and policies.  This Court has the

authority to hold unlawful, set aside, and vacate BLM's arbitrary and capricious actions under the

Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

First, in reviewing and approving the project, BLM violated NEPA by failing to take the

required "hard look" at: (1) the Project's direct, indirect, and cumulative impacts; (2) reasonable

alternatives to the Project; and (3) the baseline conditions of the areas that may be affected by the

Project.

BLM approved both the extensive exploration drilling operations and the full-scale 30-year

mine, yet admits that there is no detailed plan or proposal to process the excavated minerals from

the mine.  BLM also admits that neither it nor the company know the extent of the purported ore

body, or even if the mine would be feasible.  In essence, BLM approved a full-scale mine with

nowhere to go.  Such carte-blanche, cart-before-the-horse decision making is not permitted under

NEPA, FLPMA, and BLM mining regulations.

Under NEPA, BLM is obligated to fully consider all "direct, indirect, and cumulative

impacts" from the Project, including the impacts from all "reasonably foreseeable future actions."

BLM admits that the processing mill is necessary, indeed there could be no viable mine without the

mill, yet BLM's EA has no details about the mill or its impacts, outside of a vague reference to a

potential mill location on the north side of Deming and a few numbers taken from letters between BLM and AM, estimating the mill's water and energy usages.

Second, BLM's decision to approve 30 years of full-scale mining before exploration of the purported ore body has even occurred violates BLM's mining regulations and policy which mandate that the agency cannot approve full mining before the initial exploration occurs.  Pursuant to its duty to "prevent unnecessary or undue degradation" (UUD) under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all mineral operations follow the "performance standards" at 43 C.F.R. § 3809.420. This includes the requirement that BLM review and approve operations in the logical sequence of operations – where exploration is a prerequisite of actual mining, excavation, and processing.

For these and the related reasons addressed herein, Plaintiffs ask this court to declare that BLM's actions violate NEPA and FLPM and their implementing regulations and policies.  Plaintiffs ask this court to vacate and remand BLM's decisions and enjoin any road construction, exploration drilling, mining, and other project-related operations pending compliance with federal law.

**I.     BLM Violated NEPA.**

     A.     Statutory and Regulatory Background.

Congress enacted NEPA to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321; *see also Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1185 (10th Cir. 2006) (quoting same).  NEPA is recognized as the "centerpiece of environmental regulation in the United States." *Richardson*, 565 F.3d at 703.

NEPA recognizes that "each person should enjoy a healthful environment," 42 U.S.C. § 4331(c), and was enacted to ensure that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without

degradation, risk to health or safety, or other undesirable and unintended consequences," among other policies. *Id.* § 4331(b).

NEPA has two primary aims.  First, it obligates federal agencies "to consider every significant aspect of the environmental impact of a proposed action." *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1207 (10th Cir. 2002) (*quoting Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)).  Second, it "ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process." *Id.*  "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires all Federal agencies to take a "hard look" at the environmental impacts of their decisions before the decision is made. *See* 42 U.S.C. § 4332(2)(C); *Robertson*, 490 U.S. at 349-50.  Conclusory statements regarding impacts without adequate discussion do not constitute the required "hard look" under NEPA. *Davis v. Mineta*, 302 F.3d 1104, 1122-23 (10th Cir. 2002).

The agency's "hard look" analysis must utilize "public comment and the best available scientific information." *Colo. Envtl. Coal.*, 185 F.3d at 1171.  The agency must carefully gather and consider relevant "detailed information concerning significant environmental impacts" and share that information with the public. *See Robertson*, 490 U.S. at 349; *Greater Yellowstone Coal.*, 359 F.3d at 1277.

The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA, which are binding on all federal agencies. 40 C.F.R. Part 1500.[4]  BLM and the

---

[4] The Council on Environmental Quality revised its national NEPA regulations in 2020, which became effective on September 14, 2020. 85 Fed. Reg. 43304-43376 (July 16, 2020).  Because

Department of the Interior have promulgated NEPA regulations, 43 C.F.R. Part 46, and policies, NEPA Handbook H-1790-1, which are also binding upon BLM.

Agencies must prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  To determine whether a proposed action significantly affects the environment, requiring preparation of an environmental impact statement (EIS), an agency may first prepare an environmental assessment (EA). 40 C.F.R. § 1501.4(c).  If the agency determines based on the EA not to prepare an EIS, it issues a Finding of No Significant Impact (FONSI). *Id*. § 1501.4(e).  A court reviewing this decision must determine "whether the agency acted arbitrarily and capriciously in concluding that the proposed action will not have a significant effect on the human environment." *Davis*, 302 F.3d at 1112.

An EA must include a full and adequate analysis of environmental impacts of a project and its alternatives and must also include a "hard look" at the direct, indirect, and cumulative impacts of the project and its alternatives, resulting from all past, present, and reasonably foreseeable future actions. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9, 1508.25(c).  NEPA requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

An "effect," or impact, that must be fully analyzed in an EA "includes ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8(b).  Direct effects "are caused by the action and occur at the same time and place" as the

---

BLM conducted its NEPA review for this project before the new regulations became effective, however, the CEQ NEPA regulations existing prior to September 14, 2020 (issued in 1978), at 40 C.F.R. Part 1500, apply to the project and this Court's review.  In addition, the Secretary of the Interior issued Order #3399, on April 16, 2021, which states, "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020." Order at 3-4 (Exhibit 6).  Thus, the 1978 NEPA rules, quoted herein, apply.

proposed project. *Id.* § 1508.8(a).  Indirect effects "are caused by the action and are later in time or

farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

> Cumulative effects/impacts are defined as:
>
> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

*Id.* § 1508.7.

NEPA also requires that the agency analyze the current baseline conditions of the areas that

may be affected by the project or its alternatives.  BLM must "describe the environment of the

area(s) to be affected or created by the alternatives under consideration." *Id.* § 1502.15.  "Without

establishing the baseline conditions . . . there is simply no way to determine what effect the [action]

will have on the environment, and consequently, no way to comply with NEPA."  *Half Moon Bay*

*Fisherman's Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

Agencies must also "study, develop and describe appropriate alternatives," including a no

action alternative. 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1508.9, 1508.14.  "In general, NEPA

analysis uses a no-action alternative as a baseline for measuring the effects of the proposed action."

*Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1269 (10th Cir. 2014).

Regarding BLM's failure to even consider the alternative of only approving the exploration

drilling project, as opposed to the exploration and full-scale mining at the same time, NEPA

requires BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40

C.F.R. § 1502.14(a).  The alternatives considered should include those "that will avoid or minimize

adverse effects of the actions upon the quality of the human environment." *Id.* § 1500.2(e).

In its alternatives analysis, the agency must "present the environmental impacts of the

proposal and the alternatives in comparative form, thus sharply defining the issues and providing a

16

clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14; *see also* § 1505.1(e).  This requires the agency to "[d]evote substantial treatment to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits." *Id*. § 1502.14(b).  BLM must "state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies." *Id*. § 1502.2(d).  For alternatives that are excluded from agency analysis, the agency must fully explain that decision. *Id.* § 1502.14(a).

NEPA also requires the BLM to fully analyze all mitigation measures, their effectiveness, and any impacts that might result from their implementation.  BLM's environmental review must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," *Id.* § 1502.14(f); and (2) "include discussions of: . . . [m]eans to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." *Id.* § 1502.16(h).  "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981).  NEPA requires that BLM review mitigation measures as part of the NEPA process -- not in some future decision shielded from public review. 40 C.F.R. § 1502.16(h).

Overall, a failure to conduct a NEPA-compliant EA renders the resulting FONSI necessarily inadequate and illegal under NEPA. *See Ctr. for Biological Diversity v. NHTSA*, 508 F.3d 508, 557 (9th Cir. 2007) (When an EA fails to comply with NEPA requirements, it "do[es] not constitute a 'hard look' at the environmental consequences of the action as required by NEPA.  Thus, the FONSI is arbitrary and capricious."), *opinion replaced and amended on other grounds by Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008); *see*

*also Colo. Wild Horse & Burro Coal., Inc. v. Jewell*, 130 F. Supp. 3d 205, (D.D.C. 2015) (the agency "must have taken a 'hard look' at the problem in preparing the EA." (citations omitted)).

      B.    <u>BLM's Review and Approval of the Project Violates NEPA.</u>

      *1.    BLM Failed to Analyze the Impacts from the Project's Processing Mill.*

BLM approved the full-scale mining project without knowing critical details about the mill that will be essential to process the ore from the mine.  The mill is necessarily part of the proposed action.  Without a mill to process the ore, there could be no viable mine.  Yet, under NEPA, BLM cannot ignore the obvious and certain indirect and cumulative impacts from this reasonably foreseeable, indeed necessary for the mine to be viable, action.

In the EA, BLM acknowledged that it lacks sufficient information on the mill, especially its environmental impacts, baseline conditions, and other critical information: "American Magnesium expects to identify a potential processing facility site and apply for a permit to process the magnesium ore, in 2020.  One conceptual mill site could be located on private land at the Peru Industrial Site [just north of Deming]." EA at 22, AR 00000038.  No detailed analysis is provided about this "potential site" that "could be located" near Deming.  AM has yet to "apply for a permit to process the magnesium ore" from any state or local agency.

BLM must analyze the environmental consequences of such "reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Colo. Env't Coal.*, 185 F.3d at 1176 (quoting 40 C.F.R. § 1508.7).  The Tenth Circuit recognized that an agency's "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *Richardson*, 565 F.3d at 718 (holding cumulative impacts assessment inadequate where environmental impacts of a planned gas field were reasonably foreseeable but not analyzed).  "A

NEPA analysis requires the consideration of cumulative impacts in an EA." *Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F. Supp. 2d 1232, 1241 (D. Wyo. 2005); *see also Davis,* 302 F.3d at 1125 ("The EA does not provide an adequate discussion of the cumulative impacts of the Project on the human environment.").

The Tenth Circuit recently reiterated the comprehensive requirements for an agency's cumulative impacts analysis:

> A meaningful cumulative impact analysis must identify five things: (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate. *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (quoting TOMAC, *Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006)).

*Dine Citizens Against Ruining Our Env't v. Haaland*, --- F.4th ---, 2023 WL 1430620, *13 (10th Cir. Feb. 1, 2023) (holding BLM EA failed to adequately consider cumulative air pollution from approval of oil and gas drilling permits).

"In an EIS or EA, federal agencies must consider the direct, indirect, and cumulative predicted impacts of a proposed action. [*Richardson*], 565 F.3d at 703 (citing 42 U.S.C. § 4332(2)(C); 40 C.F.R. pt. 1502 & §§ 1508.11, 1508.25(c))." *Citizens for a Healthy Community v. BLM*, 377 F. Supp. 3d 1223, 1236 (D. Colo. 2019) (holding that BLM failed to consider the indirect impacts of combustion of oil and gas when approving drilling plan).

> Indirect impacts are defined as being caused by the action and are later in time or farther removed in distance but still reasonably foreseeable." *Utahns for Better Transp. [v. U.S. Dept. of Trans.]*, 305 F.3d [1152] at 1177 [(10th Cir. 2002)] (citing 40 C.F.R. § 1508.8(b)). An effect is considered reasonably foreseeable if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *Colo. Envtl. Coal. v. Salazar*, 875 F.Supp.2d 1233, 1251 (D. Colo. 2012) (citing cases).

*Id.*

19

The Department of the Interior and BLM have adopted their own regulations to supplement CEQ's NEPA regulations.  These supplemental regulations require analysis of the cumulative impacts from all reasonably foreseeable actions.  "*Reasonably foreseeable future actions* include those federal and non-federal activities not yet undertaken, but sufficiently likely to occur, that a Responsible Official of ordinary prudence would take such activities into account in reaching a decision." 43 C.F.R. § 46.30 (emphasis in original).  BLM cannot defer conducting an analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time. *Richardson*, 565 F.3d at 718.

BLM had informed AM that the agency could not conduct the required NEPA/FLPMA analysis, nor legally approve the mining plan under FLPMA, without a detailed description of the processing plant operations and its impacts.

> Consistent with the surface management regulations at 43 C.F.R. 3809.411(a), the BLM has reviewed the Plan for completeness relative to 43 C.F.R. 3809.40l(b). Based on our review, the following information is required in order for the Plan to be complete:
> …
> 11.   BLM comment 6 response states the Peru Industrial Site might be the location for ore processing.  **Before the BLM can issue a decision on the Plan, a definitive location must be determined in order for the BLM to complete a National Environmental Policy Act analysis on the Plan**.
>
> 12. BLM comment 7 response states that a Conceptual Feasibility of Magnesium Metal Complex near Deming, New Mexico report would be provided to give BLM details on how the ore will be processed. This report has not been provided to the BLM. **The BLM cannot determine if your Plan will cause unnecessary and undue degradation to public land without information about how the ore will be processed**.

BLM 12-8-17 letter to AM, at 1-2, AR 00004579-80 (emphasis added).

This letter was the result of the review by BLM officials in charge of the analysis of the Project.  They acknowledged that the agency needed to analyze the impacts from the mill before approving the Project: "BLM would need certain information for the operations on non-Federal land to complete the required NEPA analysis for the project." June 27, 2017 BLM email and

20

Memorandum from Kenneth Gardner (Exhibit 7).[5] *See also* June 28, 2017 BLM email, noting that there is "no consideration of the conveyor and magnesium [processing] complex." (Exhibit 8.)[6]; June 29, 2017 BLM email, acknowledging that "[t]he Plan also has no details about the conveyor and magnesium complex. As the plan is incomplete, the BLM requested additional information." (Exhibit 9); July 17, 2017 BLM email, noting that "BLM … would require detailed information about the quarry … and magnesium processing facility for … [the] NEPA analysis." (Exhibit 10); May 12, 2017 BLM letter to AM, attached to the July 17, 2017 email (Exhibit 10), requiring AM to "identify the process(s) used to extract magnesium from dolomite. What type of products and waste will come from the process(s)? Where will the waste be stored?"

Outside of a vague intention to construct and operate the mill at a vacant-land site north of Deming, and some generalized mention of potential processing methods, the record contains no details of the milling and its impacts, including of the site conditions, of the air and water pollution from the mill, of the waste dumping and byproducts from the milling, of the sources of water needed for the mill (and impacts from water withdrawals in the area), and of impacts to the Deming communities that will bear the brunt of the ore hauling and industrial truck traffic.

At most, in a letter to BLM, AM provided an estimate, with no detailed analysis in support, of the annual water usage (17 million gallons), electricity and natural gas usage, and greenhouse gas emissions (but no estimates of emissions of the Clean Air Act Criteria pollutants from the mill and truck traffic). AM 10-18-19 letter to BLM, AR 0005610-17; AM 11-04-49 letter to BLM, AR

---

[5] Along with the other internal agency documents attached to this Opening Brief, this was one of the documents originally withheld by BLM, but later produced to the Plaintiffs after this Court's Order resolving Plaintiffs' motion on the administrative record, which are now submitted pursuant to this Court's approval of the Joint Stipulation. (Doc. 46).

[6] AM had originally proposed to transport the rock from the mine to the processing plant north of Deming via a conveyor that would be constructed, but later changed its plans to instead truck the rock through Deming (the eventual plan approved by BLM).

0005618-20.  This meager information was reprinted in the EA without further analysis of foreseeable impacts. EA at 22, Table 4, AR 000038.  Yet BLM approved the full-scale mine anyway, in violation of its duties to consider all aspects of the mining and processing under NEPA and FLPMA, and its public resource protection duties under FLPMA.

As BLM acknowledged in its December 8, 2017 letter to AM, as well as in the numerous internal staff emails quoted above, NEPA and FLPMA require that BLM fully review the impacts from the mill and related activities. AR 00004580 (Dec. 8, 2017 letter); Exhibits 7, 8, 9, 10.  But BLM failed to require that AM provide the needed information.

In an August 9, 2019, "Information/Briefing Memorandum" from Defendant Bill Childress, Las Cruces District Manager, BLM admitted that details about the magnesium processing plant needed to be provided and analyzed.  "AM agreed the mill site needed to be included in the NEPA analysis." Exhibit 11.

However, AM then refused to provide the required information, and BLM acquiesced: "Later, AM informed BLM they had been advised not to share the mill site details, and asked BLM to move forward with drafting the EA without it." *Id*.  That is exactly what BLM did – completing the EA and approving the entire Project without requiring AM to provide the information necessary to fully analyze the mill and associated impacts.  BLM did not explain the reason for its change in its previous position that the agency needed to include a review of the mill's impacts in its EA in order to comply with NEPA and FLPMA.

Yet under its mining regulations, BLM has the duty to require permit applicants such as AM to provide the needed information to allow BLM to meet its NEPA and FLPMA obligations.  The agency cannot avoid reviewing impacts simply because the mining company "had been advised not to share the mill site details" with BLM and never provided the necessary information.

22

"The BLM may require information beyond that submitted with an initial MPO [Mine Plan of Operations].  '[I]nsofar as BLM has determined that it lacks adequate information on *any* relevant aspect of a plan of operations, BLM not only has the authority to require the filing of supplemental information, it has the obligation to do so.' *Great Basin Mine Watch*, 146 I.B.L.A. 248, 256 (1998)." *Ctr. for Biological Diversity v. Dep't of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010) (emphasis in original) (relying on BLM mining regulations at 43 C.F.R. § 3809.401).

The federal courts have regularly faulted BLM for the same failure to review the indirect or cumulative impacts from mineral processing facilities when approving the mine that will produce ore for the mill. *See Ctr. for Biological Diversity v. U.S. BLM*, 2023 WL 387609, \*\*4-7, Civ. No. 4:21-cv-00182-BLW (D. Idaho Jan. 24, 2023) (BLM violated NEPA in failing to review the indirect impacts from the off-site processing mill in approving a phosphate mine).

The Ninth Circuit held the same in *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009), where BLM failed to consider impacts from the transport and off-site processing of ore from a proposed gold mine.  "BLM's failure to consider the transport and processing of five million tons of refractory ore over a ten-year period show[ed] that it did not take the requisite 'hard look' at the environmental impacts of the proposed project." *Id*. at 726.  "The air quality impacts associated with transport and off-site processing of … ore are prime examples of indirect effects that NEPA requires be considered." *Id.* at 725.

The fact that the necessary mill would not be on BLM-managed public land does not mean that BLM can simply ignore its own requirements or fail to review the impacts from, and alternatives to, the processing facilities.  Cumulative impacts must be reviewed "regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Federal courts have rejected arguments from federal agencies "that cumulative impacts from non-Federal actions need not be analyzed because the Federal government cannot control them. That

23

interpretation is inconsistent with 40 C.F.R. § 1508.7, which specifically requires such analysis." *Ctr. for Biological Diversity*, 538 F.3d at 1217; *see also Colo. Envtl Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1212 (D. Colo. 2011) (rejecting the government's argument that it did not have to look at the impacts from the off-site mill because the mill would be on private lands).

Further, the fact that AM is required obtain the needed air and water pollution permits and other approvals from state and local agencies does not excuse BLM from analyzing the direct, indirect, and cumulative impacts from the mill. "This argument [by BLM] evinces a misunderstanding of the nature of NEPA and its relationship to 'substantive' environmental laws such as the Clean Air Act." *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1103 (9th Cir. 2016).

Although various other permits would regulate the substantive environmental impacts on private lands (e.g., water and air pollution from the mill), BLM has a separate duty under NEPA to fully analyze these impacts and cannot defer to some future review by another agency, especially when NEPA does not apply to that agency (the case with state agencies). That is because "[a] non-NEPA document ... cannot satisfy a federal agency's obligations under NEPA." *S. Fork Band Council*, 588 F.3d at 726. In rejecting this same BLM argument, the court in *S. Fork Band Council* held that a failure to discuss air pollution emissions from the proposed off-site processing facility was not excused by the fact that the facility "operate[d] pursuant to a state permit under the Clean Air Act." *Id*. *See also Great Basin Res. Watch*, 844 F.3d at 1104 (same).

In order for the FONSI to be sufficiently supported by the record, the NEPA regulations include factors that must be considered to determine whether the impacts may be significant. One of these factors is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

24

At a minimum, BLM cannot issue a FONSI and EA when it has failed to analyze the impacts from the mill, infrastructure, and related activities of traffic and transport, where "it is reasonable to anticipate a cumulatively significant impact on the environment" from the combined impacts of these operations with the mine. *Id.*; *see also* 40 C.F.R. § 1508.27(b)(3) (providing that significance may exist due to "[u]nique characteristics . . . such as proximity to park lands . . .or ecologically critical areas"). BLM should have analyzed the obvious effects of transporting ore through Deming and of operating a large-scale industrial processing mill just north of town.

### 2.      *BLM Failed to Consider and Analyze All Reasonable Alternatives.*

BLM also failed to fully consider all reasonable alternatives, including the alternative of approving just the exploration project, instead of both exploration and full-scale mining at the same time. BLM only considered one action alternative – AM's proposed plan – along with the no-action alternative (denial of the project). 2021 DR at 3, AR 0000116. BLM also briefly considered, but quickly rejected, alternative ore-hauling routes through Deming. EA at 23, AR 0000039.

In their EA comments to BLM, Plaintiffs specifically requested that BLM review the reasonable alternative that the agency only consider the exploration at this time. AR 00007719. Yet BLM refused, without explanation, to consider Plaintiffs' proffered alternative, despite the fact that AM and BLM considered the exploration operations separate and distinct from the later mining. AM and BLM understood that mining was contingent upon the exploration results: "if mining operations do not begin within 1 year of the end of verification drilling, AmMg will reclaim the disturbances related to the verification drilling program." AM Revised 2020 PoO at 13, AR 0005657.

Further, although exploration would proceed immediately, mining would not occur until the mill was permitted and construction begun.  "AmMg plans to initiate mining operations once

construction of the processing facility begins." *Id.*  "American Magnesium would not begin mine

operations until the processing of the ore has been permitted by the appropriate agencies, including

municipal and state agencies." EA at 22-23, AR 0000038-39.  AM has yet to apply for any permits

to construct and operate the mill.  Because Plaintiffs' proffered alternative was consistent with

BLM's and AM's understanding that exploration and mining were two sequentially distinct phases

of the Project, BLM's refusal to consider Plaintiffs' alternative violated NEPA's requirement that

the agency fully consider all "reasonable alternatives."

BLM had also acknowledged that there were alternatives to processing magnesium besides

the only one it reviewed – the "Peru" site north of Deming:

> The BLM has identified three potential alternatives for addressing the hypothetical Pidgeon
> thermic reduction process of magnesium from dolomite.
> 1.     Alternative 1: Analyze the mill site/processing at the Peru site, as originally
>        proposed.
> 2.     Alternative 2: Analyze material transportation to mill sites in Canada, South
>        America, Europe or Asia.
> 3.     Analyze both Alternatives 1 and 2.

BLM "Information/Briefing Memorandum" (Exhibit 11).  BLM never reviewed Alternative 2 in the

EA.

NEPA requires the agency to "study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal that involves unresolved conflicts concerning

alternative uses of available resources." 42 U.S.C. § 4332(E); *see also* 40 C.F.R. § 1508.9(b).  It

must "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed

action. 40 C.F.R. § 1502.14(a).  "While a federal agency need not consider all possible alternatives

for a given action in preparing an EA, it must consider a range of alternatives that covers the full

spectrum of possibilities." *Ayers v. Espy*, 873 F. Supp. 455, 473 (D. Colo. 1994).

> NEPA requires that the Agencies "[r]igorously explore and objectively evaluate all
> reasonable alternatives, and for alternatives which were eliminated from detailed
> study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. §

26

1502.14(a). The range of alternatives that the agency must consider is not infinite, of course, but it does include all reasonable alternatives to the proposed action.

*Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002).

Further, as detailed below, under FLPMA, BLM policy and regulations require that it can only approve mineral operations in a logical sequence, starting with exploration standing alone. Thus, approving the exploration and full-scale mining at the same time, without considering the reasonable alternative of approving only exploration, violates BLM's duties to consider this reasonable alternative.

### 3.    *Failure to Analyze Baseline Conditions of the Affected Areas.*

BLM must "describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15.  Here, BLM failed to fully analyze baseline conditions for the critical water, air, wildlife, and other resources that will be adversely affected by the Project.  As discussed above, BLM did not analyze the baseline conditions of Criteria Pollutants under the federal Clean Air Act such as CO, VOCs, Ozone, SO2, NOx (i.e., BLM only looked at the current particulate matter (PM) levels in the area) – all pollutants that will be emitted from the exploration, mining, transportation, and processing of the minerals.

This is true for the operations on BLM lands as well as the connected processing operations and ore and product transport.  Without an analysis of the airshed's baseline conditions and the project's air quality impacts for all Criteria Pollutants, BLM cannot ensure compliance with all state and federal environmental standards, including standards for all Criteria Pollutants under the Clean Air Act.

Regarding wildlife conditions, the EA admits that critical wildlife surveys have yet to be done:

> Any ground clearing or other disturbance (such as creating cross-country access to sites, drilling, and/or construction) during the migratory bird (including raptors) nesting season (March 1 -August 31) risks a violation of the Migratory Bird Treaty Act. Disturbance to nesting migratory birds should be avoided by conducting surface disturbing activities outside the migratory bird nesting season.  If surface disturbing activities must be implemented during the nesting season, a preconstruction survey for nesting migratory birds will be performed by a qualified wildlife biologist[.]  If active nests are found, an appropriately-sized no surface disturbance buffer determined in coordination with the BLM biologist will be placed on the active nest until the nesting attempt has been completed.

EA at 17-18, AR 00000033-34.

Yet this "preconstruction survey for nesting migratory birds" should have been done as part of the NEPA process, subject to public review – particularly since BLM knows the March-August nesting season for migratory birds.  In addition, this post-approval decision process to determine "an appropriately-sized no disturbance buffer" is shielded from any public review in violation of NEPA and FLPMA.  The public will have no opportunity to comment, or provide scientific critique, on this "buffer" that will be developed by AM and BLM sometime in the future.

BLM cannot rely on such future mitigation measures to avoid collecting and analyzing the required baseline information/data.  When an agency review "does not provide baseline data for many of the species, and instead plans to conduct surveys and studies as part of its post-approval mitigation measures," federal courts have held that the agency "did not take a sufficiently 'hard look' to fulfill its NEPA-imposed obligations at the impacts as to these species prior to issuing its decision." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011) (reversing decision due to inadequate baseline information).

Mitigation measures are an insufficient proxy for adequate baseline data because they do not further either of the twin aims of NEPA: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Id.* at 1072.  For this reason, the court in *Gifford Pinchot Task Force v. Perez* rejected the

28

mining company's "arguments that a baseline groundwater analysis [wa]s not required before the issuance of the EA because the sampling and monitoring [we]re being used to confirm that no significant impacts are occurring rather than addressing an issue of insufficient data." 2014 WL 3019165, *31 (D. Or. 2014).

Further, for wildlife conditions and impacts, BLM only considered (albeit inadequately) the baseline conditions and impacts within the limited 40-acre "project area." *See* AM's Biological Evaluation at 3 (Appx. E to AM 2018 PoO), AR 00005160-64.  Not only does this ignore the impacts from the transport and processing of the minerals as noted herein, but also the obvious fact that impacts will be felt by wildlife outside the 40 acres (e.g., migration, travel, noise/air/visual/etc. impacts). *See Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1179-80 (10th Cir. 2002) (agency erroneously limited its environmental review to only the project area and small, 1,000-foot buffer).

As held by the Interior Department's Board of Land Appeals, under NEPA and FLPMA, BLM's environmental review and protection duties extend to all resources affected by the Project, and the agency cannot artificially truncate its review to just the immediate project lands.  NEPA "requires BLM to consider the nature and extent of surface disturbances resulting from a proposed operation and environmental impacts on resources and lands outside the area of operations." *Island Mountain Protectors*, 144 IBLA 168, 202, 1998 WL 344223, * 28 (1998) (internal citations omitted).

>>>

>>>

>>>

>>>

II.     **BLM Violated FLPMA.**

    A.     Statutory and Regulatory Background.

FLPMA requires that, "[i]n managing the public lands the Secretary [of Interior] shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  BLM cannot approve a mining plan of operations that would cause "unnecessary or undue degradation." 43 C.F.R. § 3809.411(d)(3)(iii) (BLM mining regulations).

The duty to "prevent undue degradation" is "the heart of FLPMA [that] amends and supersedes the Mining Law." *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 33 (D.D.C. 2003). "FLPMA, by its plain terms, vests the Secretary of the Interior [and the BLM] with the authority – and indeed the obligation – to disapprove of an otherwise permissible mining operation because the operation, though necessary for mining, would unduly harm or degrade the public land." *Id.* at 42. "FLPMA's requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law." *Ctr. for Biological Diversity*, 623 F.3d at 644.  BLM complies with this mandate "by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation." *Id.* at 645, *quoting Mineral Policy Ctr.*, 292 F. Supp. 2d at 44.  As part of its duty to prevent UUD, BLM must ensure that all operations comply with the Performance Standards found at 43 C.F.R. § 3809.420. *See* 43 C.F.R. § 3809.5 (definition of UUD, specifying that failing to comply with the Performance Standards set forth at § 3809.420 constitutes UUD).

    B.     BLM's Review and Approval of the Project Violates FLPMA.

        *1.     BLM Erroneously Approved Both the Initial Exploration and Full Mine at the Same Time.*

The 2021 DR authorizes both initial exploration as well as 30 years of full-scale open pit mining.  Yet that is contrary to BLM mining policy under FLPMA which requires that at most,

30

BLM can only consider an alternative of authorizing the exploration aspect of the project to ascertain the nature and extent of the deposit, and cannot consider or approve the entire open pit mineral extraction operations until the agency obtains that evidence.

BLM mining regulations and policy mandate that BLM cannot approve full-scale mining operations at the same time as the initial exploration, especially when so little is known about the purported mineral deposit to be excavated.  Pursuant to its duty to "prevent unnecessary or undue degradation" under FLPMA, 43 U.S.C. § 1732(b), BLM requires that all mineral operations follow the "Performance Standards" at 43 C.F.R. § 3809.420.  This includes the requirement that BLM review and approve operations in the logical sequence of operations – where exploration is a prerequisite of actual mining/excavation/processing.

> **The operator must avoid unnecessary impacts and facilitate reclamation by following a reasonable and customary mineral exploration, development, mining, and reclamation sequence** [citing 43 CFR 3809.420(a)(2).] This performance standard is designed to prevent unnecessary impacts from operations that are conducted out of sequence with the reasonable and customary mineral exploration, development, mining, and reclamation cycle. (See also 43 CFR 3715.0-5, which defines "reasonably incident," in part as, "using methods, structures, and equipment appropriate to the geological terrain, mineral deposit, and *stage of development*" (emphasis added).)
>
> This standard is to be applied on a broad scale. For example, **an operation that proposes stripping soil from an area for mining purposes prior to even attempting to identify the presence of a mineral deposit using standard industry practices would not meet this performance standard.**

BLM Minerals Handbook, Section H-3809-1, Surface Management, at 5-3 (PDF p. 93 of 361)[7] (Sept. 17, 2012) (emphasis added) (excerpts of Handbook attached as Exhibit 12).

But that is what BLM approved here – AM's stripping/excavating/blasting of the full mine pit "prior to even attempting to identify the presence of a mineral deposit using standard industry practices." *Id.*  Thus, BLM essentially admits that it "would not meet this performance standard."

---

[7] *Available at* https://www.blm.gov/sites/blm.gov/files/H-3809-1.pdf (last viewed Feb. 13, 2023)

*Id.* As such, BLM violated its duties to prevent UUD under 43 U.S.C. § 1732(b) and the mandatory "performance standards" at 43 C.F.R. § 3809.420.

In a significant departure from its regulations and accepted practice, BLM's 2021 DR authorized AM's mining Plan of Operation (PoO) for full-scale mining without having any real evidence about the mineral resources at the site. This was acknowledged by AM:

> **There is not sufficient information to estimate mineral resources for the deposit at this time**. … The actual thickness of the Dolomite deposit in the Project Area (within AmMg's two mining claims) is unknown at this time. There is no vertical drill hole information for the deposit. All samples are surface chip only and cannot be used to verify the vertical and lateral continuity and grade [of the dolomite].

AM 2018 PoO at 42, AR 0005045 (emphasis added); *see also* AM Revised 2020 PoO, at 35-36, AR 0005679-80 (same).

Thus, as the agency knew, there had been no drilling or exploration at the site, outside of some very limited "chips" taken from the immediate surface. Yet BLM cannot credibly estimate mineral reserves or resources, approve products to be mined and processed, approve open pit operations, and anticipate and mitigate environmental problems and approve a reclamation plan, when it has little or no knowledge of the deposit to be mined.

The requirement that approved operations are limited to the appropriate stage of development is also part of the congressional restriction that BLM can only approve "reasonably incident" operations under the 1955 Surface Resources Act, 30 U.S.C. § 612(a), as well as the FLPMA prohibition against "unnecessary or undue degradation (UUD)." As BLM's Minerals Handbook states:

> Under the Surface Resources Act of 1955, mining claims may not be used "for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto." **Any activity that is not reasonably incident as defined in 43 CFR 3715.0-5 is by definition UUD within the meaning of 43 CFR 3809.5.**

Handbook at 5-2 (emphasis added).  As the Handbook notes, "reasonably incident" is defined "in part as, 'using methods, structures, and equipment appropriate to the geological terrain, mineral deposit, and *stage of development*' (emphasis added).)" Handbook at 5-3, *quoting* BLM mining and occupancy regulations at 43 C.F.R. § 3715.0-5.

BLM officials understood that approving the full mine and exploration at the same time did not comply with its regulations and policies.  "[T]he operator should be submitting a surface management notice or plan of operations for only exploration/definition drilling at this point in time." July 17, 2017 BLM email (Exhibit 10).  As BLM stated:

> [I]t does not appear the BLM can do more at present than evaluate/approve a plan of operations for an exploration drilling project. That is, the company would need to define a resource/reserve and complete the appropriate engineering design and background studies to produce a preliminary economic analysis and at least a pre-feasibility study for the project (open pit mine, conveyor and mill) before having the information necessary for a plan of operations involving the quarry that the BLM could evaluate/approve. **For the company to do otherwise would not appear to be a use reasonably incident to a mining claim per 30 USC 612(a).**

June 27, 2017 BLM email Memorandum, at 2 (emphasis added) (Exhibit 7).  The agency questioned "the appropriateness [of the approval] of a mine/mill before exploration." June 28, 2017 BLM email (Exhibit 8).  Yet that is what BLM did here when it approved the Project.

Further, AM and BLM understood that the exploration was separate from the mining and that mining was contingent upon the exploration results.  AM recognized that mining may not even occur, and could wait up to a year after the exploration drilling was completed: "if mining operations do not begin within 1 year of the end of verification drilling, AmMg will reclaim the disturbances related to the verification drilling program." AM Revised 2020 PoO at 13, AR 0005657.

Mining is also dependent on the construction of the mill, which does not have any state or local permits (or even applications for permits): "AmMg plans to initiate mining operations once

33

construction of the processing facility begins." *Id.* The "magnesium [processing] complex should be operational before any mining occurs at the quarry." June 27, 2017 BLM email (Exhibit 7).

Requiring that exploration and mineral verification be completed first, before BLM considers a Plan of Operations for full-scale actual mining, is certainly feasible in this case, and would inform any decision whether to approve full-scale mining. AM's consultant advised AM that exploration could be conducted prior to proposing a full mining plan or even conducting impactful road building activities: "RPA [AM's consultant] estimates that a diamond drilling program would yield sufficient information to qualify the MgO grade in Dolomite Mountain. A helicopter supported drill program would have the least amount of surficial impact, should American Magnesium not wish to pursue roads on the mountain at this stage of the evaluation." AM's consultant report, "Site Visit Report of Florida Mountains, New Mexico claims of American Magnesium LLLP," at 17 (2014) (submitted by Plaintiffs to BLM during comment period), AR 0007741. Despite this, BLM never considered this reasonable alternative.

As noted above in the discussion of BLM's NEPA violations, "The BLM may require information beyond that submitted with an initial MPO [Mine Plan of Operations]. '[I]nsofar as BLM has determined that it lacks adequate information on *any* relevant aspect of a plan of operations, BLM not only has the authority to require the filing of supplemental information, it has the obligation to do so.' *Great Basin Mine Watch*, 146 I.B.L.A. 248, 256 (1998)." *Ctr. for Biological Diversity*, 623 F.3d at 644 (emphasis in original) (after quoting BLM mining regulations at 43 C.F.R. §3809.401).

Instead, BLM simply approved the exploration and mining in the same decision, knowing that it lacked critical information in violation of FLPMA, BLM mining regulations, and long-standing policies.

2.      *BLM Approved the Project Without Knowing Critical Details About the Project's Processing Mill and its Impacts.*

In addition to improperly approving both the exploration and mining at the same time in violation of FLPMA, BLM admits that it failed to review or require any details concerning the necessary processing mill.  BLM stated, "American Magnesium expects to identify a potential processing facility site and apply for a permit to process the magnesium ore, in 2020.  One conceptual mill site could be located on private land at the Peru Industrial Site [just north of Deming]." EA at 22, AR 0000038.  Yet BLM provided little to no analysis of other potential locations, routes, their baseline conditions, or resulting impacts related to the processing mill.

BLM's FLPMA mining regulations require, as a condition for submittal of a complete Plan of Operations and BLM's review/approval, detailed information including:

> Description of Operations. A description of the equipment, devices, or practices you propose to use during operations including, where applicable –
> (i) Maps of the project area at an appropriate scale showing the location of exploration activities, drill sites, mining activities, **processing facilities**, waste rock and tailing disposal areas, **support facilities**, structures, buildings, and access routes;
> (ii) Preliminary or conceptual designs, cross sections, and operating plans for mining areas, **processing facilities**, and waste rock and tailing disposal facilities;
> (iii) Water management plans;
> (iv) Rock characterization and handling plans;
> (v) Quality assurance plans;
> (vi) Spill contingency plans;
> (vii) A general schedule of operations from start through closure; and
> (viii) Plans for all access roads, water supply pipelines, and power or utility services[.]

43 C.F.R. § 3809.401(b)(2) (emphasis added).  Because BLM approved the Project without the required designs and operating plans for the processing mill and related facilities, it violated these FLPMA regulations, as well as its duty to review the impacts from, and alternatives to, these operations (as detailed above in the NEPA discussion).

As also discussed above, the fact that the necessary mill may not be on BLM-managed public land does not mean that BLM can simply ignore its own requirements or fail to review the

35

impacts from, and alternatives to, the processing facilities.  BLM had informed AM that the agency

could not conduct the required NEPA/FLPMA analysis, nor legally approve the mining plan under

FLPMA, without a detailed description of the processing plant operations. *See* BLM 12-8-17 letter

to AM, at 1-2, AR 0004579-80. *See also* Exhibits 7, 8, 9, 10, 11 (BLM emails, letters and

memoranda quoted above).

But except for a few general estimates of water and energy usage, the record contains no

details of the milling and its impacts, including of the site conditions, of impacts to the Deming

communities that will bear the brunt of the ore hauling and industrial truck traffic, of the air and

water pollution from the mill, and sources of water needed for the mill.  Yet BLM approved the

full-scale mine anyway, in violation of its duties to consider all aspects of the mining and

processing under NEPA and FLPMA, and its public resource protection duties under FLPMA.

As noted above in the discussion of BLM's NEPA violations, BLM has the obligation under

FLPMA to obtain this critical information and conduct detailed analysis of the full Project's

impacts. *See Ctr. for Biological Diversity*, 623 F.3d at 644; 43 C.F.R. § 3809.401 (BLM mining

regulations).

> Like NEPA, **the [FLPMA "unnecessary or undue degradation"] definition
> requires BLM to consider the nature and extent of surface disturbances resulting
> from a proposed operation and environmental impacts on resources and lands
> outside the area of operations.** *Kendall's Concerned Area Residents*, 129 IBLA 130,
> 140-41 (1994); *Nez Perce Tribal Executive Committee*, 120 IBLA 34, 36 (1991); see
> *Sierra Club v. Hodel*, 848 F.2d 1068, 1078, 1091 (10th Cir.1988) (nondegradation
> duty is mandatory). … [M]ost disturbed land at the mine sites is public land and other
> public land is adjacent to them.  To the extent BLM failed to meet its obligations under
> NEPA, it also failed to protect public lands from unnecessary or undue degradation.

*Island Mountain Protectors*, 144 IBLA 168, 202, 1998 WL 344223, * 28 (1998) (internal citations

omitted, emphasis added).

III.   **Due to BLM's Substantial Legal Errors, and the Impending Damage to Public Land and Resources from the Project, This Court Should Vacate BLM's Approval and Review Decisions.**

   A.   <u>The APA Generally Requires Vacatur of Unlawful Agency Actions</u>.

   Due to the numerous violations of federal law, and the arbitrary and capricious nature of BLM's actions, this Court should vacate the 2021 DR, FONSI, and EA.  Vacatur of BLM's Project approval is the default remedy for NEPA and FLPMA violations.  The APA mandates that, when agency action violates the law, "[t]he reviewing court shall … hold unlawful and set aside [the] agency action." 5 U.S.C. § 706(2).  The U.S. Supreme Court has repeatedly described this remedy as mandatory. *F.C.C. v. Nextwave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)).  Hence, when a plaintiff prevails on an APA claim, the "typical remedy" is "remand to the district court with instructions to vacate the agency action." *High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020); *see WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017) ("Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."); *see also Diné Citizens Against Ruining Our Environment v. Jewell*, 312 F. Supp. 3d 1031, 1110 (D.N.M. 2018) ("[T]he presumption is in favor of vacatur instead of remand without vacatur.") (rev'd on other grounds, *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019)); *N.M. Health Connections v. U. S. Dept. of Health & Human Srvs.***,** 340 F. Supp. 3d 1112, 1175-79 (D.N.M. 2018) (concluding that vacatur was the appropriate remedy due to fundamental flaws in the agency's decision).  Given the NEPA and FLPMA violations at issue in this case, vacatur is the proper remedy to ensure that BLM will not simply treat remand of its Project decision as "a mere bureaucratic formality." *Diné CARE v. OSMRE*, No. 12-cv-01275—JLK, 2015 WL 1593995, at *3 (D. Colo. April 6, 2015).

37

B.      Vacatur is Warranted Under the *Allied-Signal* Test.

The Tenth Circuit recently recognized a limited exception to the default APA standard

vacatur remedy and adopted the *Allied-Signal* test to determine whether to remand with or without

vacatur.  *Diné Citizens Against Ruining Our Env't v. Haaland*, ---F.4th ---, 2023 WL 1430620, * 23

(10th Cir. Feb. 1, 2023).  In *Allied-Signal v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), the Court

recognized exceptions to the default vacatur remedy, articulating a test weighing "the seriousness of

the [agency action's] deficiencies" against "the disruptive consequences of an interim change that

may itself be changed."  Here, vacatur of the 2021 DR and the underlying 2020 FONSI and EA for

the Project is warranted under the *Allied-Signal* test.

*1.      BLM's NEPA and FLPMA Violations are Serious.*

Under the first factor, the Court determines the "seriousness" of the deficiencies in the

agency action. *Allied-Signal*, 988 F.2d at 150-51.  Where the agency's failing is primarily one of

inadequate explanation – and it is likely that the agency can sustain its decision by clarifying its

reasoning – vacatur can sometimes be avoided. *Standing Rock Sioux Tribe v. U.S. Army Corps of

Eng'rs*, 282 F. Supp. 3d 91, 98 (D.D.C. 2017).  In contrast, where, as here, the legal deficiency is

serious enough to raise doubts as to whether the agency "chose correctly," vacatur is warranted.

*Allied-Signal*, 988 F.2d at 150-51; *see also Nat'l Women's Law Ctr. v. OMB*, 358 F. Supp. 3d 66, 93

(D.C. Cir. 2019) (vacating rule where agency's "reasoning lacked support in the record").

Here, BLM has not simply provided inadequate explanations or committed discrete

procedural violations.  Instead, BLM decided to approve the entire Project without analyzing the

environmental impacts of the Project's processing mill. *See supra* Argument Section I.B.1.  Where

there is an "absence of analysis" rather than a "flawed analysis" in an EA, "the Court cannot

determine whether there exists a serious possibility that the [agency would] be able to substantiate

its decision on remand;" thus vacatur is warranted. *WildEarth Guardians v. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 897 (D. Mont. 2020) (citing *Allied-Signal*, 988 F.2d at 151) (internal quotation marks omitted).

### 2. *The Disruptive Impact of Vacatur is Limited and Does Not Outweigh Harm to Plaintiffs.*

The Court should balance any disruptive impacts to AM's plans to develop the Project against the disruptive impacts to Plaintiffs and their members from the unanalyzed environmental impacts of the Project that was unlawfully approved in violation of NEPA and FLPMA. *See Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 105. Plaintiffs' members will be exposed to noise and visual intrusions from drilling, blasting, truck traffic, and other industrial activities associated with the Project. Pattison Dec. ¶¶ 7, 9, 11; Light Decl. ¶ 4; Siwik Decl. ¶ 10. Thus, the disruptive environmental impacts of *not* vacating the Project pending remand are severe.

To the extent that AM claims any financial impacts from vacatur, these impacts should carry little, if any, weight in the context of NEPA and FLPMA violations. Courts have declined to give significant weight to vacatur's economic consequences. *See Standing Rock*, 282 F. Supp. 3d at 104 (economic impacts not determinative under second *Allied-Signal* factor); *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1243 (D. Colo. 2011) (finding vacatur's economic impacts on energy development projects to be "irrelevant" in environmental case). Thus, the disruptive environmental impacts of withholding vacatur outweigh any disruptive impacts that vacatur would have on AM, and the presumptive remedy of vacatur is warranted in this case.

>>>

>>>

Respectfully submitted this 21st day of February, 2023.


*/s/ Roger Flynn*
Roger Flynn (Colorado Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz (NM Bar # 23276)
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*/s/ Sally A. Paez*
Sally A. Paez (NM Bar #26215)
NEW MEXICO WILDERNESS ALLIANCE
341 E. Alameda Street
Santa Fe, NM 87501
(505) 216-9719
sally@nmwild.org

*Attorneys for Petitioners/Plaintiffs*

### Certificate of Compliance

I, Roger Flynn, hereby attest that the foregoing is less than 13,000 words and thus in compliance with Federal Rule of Appellate Procedure 32(a)(7)(b) and this Court's Order (Doc. 46).

*/s/ Roger Flynn*

### Certificate of Service

I, Roger Flynn, hereby attest that I served all parties in this case with the foregoing, by submitting it via this Court's ECF filing system, this 21st day of February, 2023.

*/s/ Roger Flynn*